FORT DEARBORN NATIONAL BANK OF CHICAGO v. FRANK A. SEYMOUR and Another.[1]

January 6, 1898.

Nos. 10,810—(211).

Note of Land Company Discounted by Chicago Bank—Cashier of St. Paul Bank Agreeing that Chicago Bank Might Charge St. Paul Bank with Note—Authority of Cashier to Pledge Bank's Credit—Fraud.

A bank in Chicago was the correspondent of a bank in St. Paul, in which the latter kept funds on deposit. The cashier of the St. Paul bank was secretary of, and a large stockholder in, a land company. The president and two of the directors of the St. Paul bank were also interested in, and stockholders of, the land company. The land company was indebted to certain parties in the sum of $25,000, which had to be met and paid. The cashier of the St. Paul bank, in his individual name, wrote to the cashier of the Chicago bank that he had been unexpectedly called on to take up $25,000 for a company in which he was interested, and did not want to borrow the money from his own bank, and asked if the Chicago bank would place an inclosed note of the land company for $25,000 to the account of the St. Paul bank; adding that the latter bank would not draw against it. To this the cashier of the Chicago bank replied that he had placed the proceeds of the land-company note to the credit of the St. Paul bank, with the understanding that none of it was to be paid out, and that they reserved the privilege of charging the land-company note to the St. Paul bank at their option. The cashier of the St. Paul bank replied, consenting to and accepting these conditions. The Chicago bank then discounted the land-company note and placed the proceeds to the

[1] Reported in 73 N. W. 724.

71 M.—6

credit of the St. Paul bank, and the latter then paid the amount ($25,000) to the land company. The St. Paul bank was not a party to the note of the land company, and had no interest in it. None of the officers of the St. Paul bank, except those who were stockholders in the land company, and interested in the transaction in their own behalf, adversely to the interests of the bank, ever authorized, knew of or ratified the agreement between their cashier and the Chicago bank, and they had no notice that the credit of $25,000 by that bank to the St. Paul bank was not an actual and unconditional credit for cash deposited. *Held*, that the agreement of the cashier of the St. Paul bank that the Chicago bank might charge up the note of the land company to the St. Paul bank was wholly without the scope of his authority; that it amounted to an attempt to pledge the responsibility of the St. Paul bank for the payment of the note of the land company, in order to enable that company to raise money to pay its own debts; that this was, in law and fact, a fraud on the St. Paul bank, —of all which facts the Chicago bank was chargeable with notice.

### Same—Notice to St. Paul Bank.

That the knowledge of the transaction by the cashier of the St. Paul bank, or by those officers who were interested with him in the land company, and were acting for themselves and adversely to the interests of the bank, did not constitute notice to the bank.

### Same—Knowledge of Chicago Bank.

That after having thus credited the St. Paul bank with the proceeds of the land-company note, and after that bank had paid over the amount to the land company, as it expected and knew would be done, the Chicago bank had no right to charge up the land-company note to the account of the St. Paul bank.

### Principal and Agent—Unauthorized Act of Agent—Ratification.

The rule that a principal must either repudiate or ratify the unauthorized act of his agent as an entirety and that he cannot accept the benefits, and repudiate the conditions or liabilities attached, has no application to the facts.

Appeal by defendants from a judgment for $5,823.09 entered against them as receivers of the Bank of Minnesota in the district court for Ramsey county, pursuant to the findings and order of Brill, J. Reversed.

*Young & Lightner*, for appellants.

*Morphy, Ewing & Gilbert*, for respondent.

MITCHELL, J.

The Fort Dearborn National Bank of Chicago (hereafter called

the "Chicago Bank") and the Bank of Minnesota of St. Paul (hereafter called the "St. Paul Bank") had been correspondents of, and making collections for, each other for some years. The St. Paul Bank also kept funds on deposit with the Chicago Bank in two accounts,—one called the "active account," subject to draft or check, and another called the "inactive account," not subject to be drawn upon, which, by arrangement between the banks, was to be at least $10,000, and to remain on deposit as security for any sums the St. Paul Bank might at any time owe the Chicago Bank on account of collections intrusted to it. On the inactive account the St. Paul Bank was to be allowed interest at two per cent. per annum. William Dawson, Jr., was the cashier of the St. Paul Bank, and the secretary and a large stockholder of the Gladstone Land Company, hereafter called the "Land Company."

In July, 1893, the Land Company was indebted in the sum of $25,000 on its five notes, held by a bank in Stillwater, which had been sent to the St. Paul Bank for collection. These notes had to be taken up, or in some way provided for. Consequently on July 13, 1893, William Dawson, Jr., wrote to the cashier of the Chicago Bank the following letter, inclosing the demand note of the Land Company for $25,000, with 6 per cent. interest, payable to the order of the Chicago Bank, and guarantied by William Dawson, William Dawson, Jr., and Philip S. Harris, all interested in the Land Company:

"L. A. Goddard, Esq., Cashier.
    "Ft. Dearborn National Bank, Chicago, Ill.
    "Dear Sir:   I have been unexpectedly called on to take up $25,000 for a company in which I am interested, and do not want to borrow the money from our own bank.   Can I get you to place the inclosed note of the Gladstone Land Company for $25,000, indorsed by Wm. Dawson, Philip S. Harris and myself, to the account of the Bank of Minnesota?   The bank positively will not draw against it, but simply increase its balance with you by that amount.   As the money will not be used, I would like to have you make as good a rate as possible on the note.   Yours respectfully, W. Dawson, Jr."

In response to this letter, the cashier of the Chicago bank, on July 14th, wrote as follows:

"Wm. Dawson, Jr., Esq.,
    "Cas. Bank of Minnesota, St. Paul.
    "Dear Sir:    We have yours 13th inst., inclosing note 25,000 Gladstone Land Co.    We place the proceeds to credit of your bank, with understanding that none of it is to be paid out, and also that we reserve privilege of charging same to your bank at our option. Kindly write us your consent to above effect, inasmuch as paper does not in any way carry the indorsement of Bank of Minnesota. Very truly, L. A. Goddard, Cas."

To this, William Dawson, Jr., as cashier of the St. Paul bank, on July 15th, replied as follows:

"L. A. Goddard, Esq., Cashier.
    "Fort Dearborn National Bank, Chicago, Ill.
    "Dear Sir:    Your favor of the 14th received, for which I thank you.    None of the proceeds of the $25,000 Gladstone Land Co. note, or any other part of our balance with you, will be checked against; and, as you request, we hereby consent that you have the privilege of charging the Gladstone Land Company note to the account of the Bank of Minnesota at your option.    Yours respectfully, W. Dawson, Jr., Ca."

Pursuant to this arrangement the Chicago Bank discounted the Land Company's note, and placed the proceeds ($25,000), to the credit of the inactive account of the St. Paul Bank.    On being advised of this, the St. Paul Bank, through its cashier, credited or paid the $25,000 to the Land Company, which presumably used it in taking up its five notes already referred to, which were in the hands of the St. Paul Bank for collection.    The cashier of the Chicago Bank admitted in his testimony that this was what he expected or anticipated at the time would be done; that his giving credit to the St. Paul Bank for $25,000 would increase the apparent resources of that bank by that amount, and that, unless the St. Paul Bank paid the Land Company the $25,000, it would have that amount of cash unaccounted for, and more than its books called for.    Indeed, in the light of the correspondence, the cashier of the Chicago Bank could not well have understood otherwise.    He must necessarily have known that the arrangement was resorted to for the purpose of providing the Land Company and William Dawson, Jr., with funds with which to pay the notes of the Land Company.

In January, 1896, the Land Company's note was renewed, under

the same arrangement, by a new demand note of the company for the same amount. This renewal was negotiated by correspondence between the cashier of the Chicago Bank and William Dawson, Jr., as cashier of the St. Paul Bank. The St. Paul Bank was neither a party to, nor interested in, the note of the Land Company, and there were no entries in the books of either bank to indicate that the St. Paul Bank was in any way liable for its payment. All that the books of the banks showed was that there was a certain sum on deposit with the Chicago Bank to the credit of the inactive account of the St. Paul Bank. There was nothing,—at least, on the books of the St. Paul Bank,—to show that this credit was not an actual and unconditional one, or that the Chicago Bank had any right to charge up to the St. Paul Bank the note of the Land Company.

There is no evidence that any of the officers or stockholders of the St. Paul Bank, except those interested in the Land Company, ever authorized, ratified or even knew of, the arrangement between their cashier and the Chicago Bank. The only scintilla of evidence to the contrary referred to by counsel is the fact that on one occasion, when the St. Paul Bank was in need of money, Mr. Copley, one of the directors, who knew from what the books showed that from $35,000 to $36,000 was on deposit in the Chicago Bank to the credit of the St. Paul Bank, suggested to some one in the bank (either William Dawson, Jr., or William Miller, who was also interested in the Land Company), that they draw against it, and that he replied "that they couldn't," but that he did not ask for any explanation why they could not. From the time this arrangement was made, in July, 1893, until the St. Paul Bank closed its doors, in December, 1896, the Land Company, through William Dawson, Jr., from time to time paid the Chicago Bank interest on its note at 6 per cent.; and that bank, according to the original agreement to that effect, credited the St. Paul Bank with interest at 2 per cent. on the amount of its inactive account, including the $25,000 credited as the proceeds of the Land Company's note.

The St. Paul Bank closed its doors and went into the hands of receivers on December 22, 1896. Immediately preceding this, according to the books of the banks, there was on deposit in the Chicago Bank to the credit of the St. Paul Bank the sum of $35,360.11,

inclusive of the $25,000; but about two hours before the latter bank closed its doors the Chicago Bank charged up to its account the Land Company's note of $25,000, which left an apparent balance of only $10,360.11 to its credit. When the St. Paul Bank suspended, it had made collections for the Chicago Bank to the amount of $29,116.16, which it had not remitted. It also had in its hands, for collection, checks and drafts amounting to $5,808.59, which were subsequently collected by the receivers. This action was brought against the receivers to recover the latter sum. The receivers, by way of defense and counterclaim, set up the deposit of $35,360.11 to the credit of the St. Paul Bank, less the $29,116.16 due from that bank to the plaintiff (amounting to $6,243.95), and demand an affirmative judgment for $435.36.

The whole case turns upon the question whether the deposit with the Chicago Bank to the credit of the St. Paul Bank was $35,360.11, or only $10,360.11; and that, in turn, depends upon the right of the Chicago Bank, under the facts stated, to charge up the note of the Land Company to the account of the St. Paul Bank. Whatever may have been the actual intention of the parties, it appears very plain to us that the arrangement between William Dawson, Jr., and the cashier of the Chicago Bank, was, both in fact and law, a fraud upon the St. Paul Bank, of which the former bank not only had notice, but in which it was an active participant. On the face of it, the transaction was nothing more or less than a scheme of William Dawson, Jr., by pledging the responsibility of the St. Paul Bank for the payment of the Land Company's note, in which that bank had no interest, to raise money with which to pay the debt of the Land Company, of which he was an officer and one of the principal stockholders.

That this was a fraud on the bank, and an agreement which he had no authority, as cashier, to make in behalf of the bank, is so plain a proposition as not to admit of argument. The correspondence, on its face, conclusively charged the cashier of the Chicago Bank with knowledge of that fact. Assuming that the St. Paul Bank had the power to do so, it had never given its cashier any authority to make any such agreement in its behalf, it had not clothed him with any apparent authority to do so, and it has never ratified

his act.   Inasmuch as William Dawson, Jr., was acting in his own interest, and in that of his company, and not in the interest of the bank, as was apparent on the face of the transaction, notice to him was not notice to the bank.   The bank cannot be charged with either notice or ratification by the acts of those of its officers who were individually and personally interested in the transaction, and who participated in it in their own behalf and adversely to the interests of the bank.   It is exclusively upon the acts of such persons that the plaintiff relies to charge the bank with notice and ratification of the transaction.

It is also contended that the bank has ratified the transaction by accepting the benefits of it, in the form of 2 per cent. interest on the $25,000.   We are by no means prepared to concede that, if the bank had done this with full knowledge of all the facts, it would, under the circumstances, have amounted to a ratification of the cashier's agreement that the Land Company's note should be charged to its account.   But it is sufficient for present purposes that none of the officers of the bank, other than those adversely interested, knew the facts.   They did not know but that this credit of $25,000 was an actual and unconditional one, unaccompanied by any agreement that it might be wiped out by charging up against it the note of the Land Company.

The learned trial court held in favor of the plaintiff, on the ground that the right of the St. Paul Bank to the credit of $25,000 was, according to the agreement of its cashier, conditional from the beginning; that it could not repudiate the condition and claim the benefits of his contract; that it must repudiate the entire transaction, or ratify it as an entirety.   At first view this may seem plausible, but it will not stand the test of strict analysis.   The rule invoked is a familiar one, but has no application to the facts.   The St. Paul Bank has not received, and is not now claiming, any benefits from the unauthorized acts of its cashier.   True, $25,000, the proceeds of the Land Company's note, was placed to its credit; but it has paid this money out to the Land Company, just as the Chicago Bank expected and knew would be done.   Placing the money to the credit of the St. Paul Bank, and that bank's then paying the amount to the Land Company, was, in effect, but a substitute for

the transmission of the actual cash to the Land Company. In paying the money to that company the St. Paul Bank was, in effect, acting as the agent of the Chicago Bank. As the St. Paul Bank was neither a party to, nor interested in, the Land Company's note, as the Chicago Bank knew, the latter bank must be deemed to have discounted it for the maker, and not for the St. Paul Bank. This it attempted to do, coupled with a condition made under an agreement with the cashier, acting, as it was bound to know, outside the scope of his agency, that it might charge up the note at any time to the St. Paul Bank. Having, under these circumstances, given the St. Paul Bank credit with the proceeds of the note, and that bank having, as it was understood it would do, paid the money over to the Land Company, the Chicago Bank cannot now assert against the St. Paul Bank that the credit had a secret string attached to it.

We have not attempted to follow the assignments of error, for the reason that the trial court made findings, and refused to make certain others, upon what we deem an erroneous view of the law applicable to the facts. Hence a new trial will be necessary in any event. We may also add that in our opinion all the facts above stated are within the issues made by the pleadings.

Judgment reversed, and new trial ordered.

On Motion for Reargument.

January 25, 1898.

PER CURIAM.

In their application for a reargument, counsel for the plaintiff call our attention to the fact that we were in error in stating that Miller, the assistant cashier of the Bank of Minnesota, was interested in the Land Company. But this is not important, for the reason that an "assistant cashier" would have no power on behalf of the bank either to authorize or to ratify the transaction.

Counsel also assume that we have held that the evidence shows that the cashier of the Fort Dearborn National Bank actually intended to perpetrate a fraud on the Bank of Minnesota. We studiously avoided making any such statement. We said that the transaction was, on its face, a fraud on that bank, whatever might have been the actual intention of the parties.

Counsel also say that the cashier had, by virtue of his office, au-

thority in behalf of his bank to guaranty the note of the Land Company. If the note had belonged to the bank, and it was desired to rediscount it for the benefit of the bank, this would doubtless be true. But it was never heard that a cashier has authority to bind his bank by any kind of "accommodation" contract. The arrangement made in this case was, on its face, in effect an attempt to bind the bank as a mere accommodation guarantor of a note in which it had no interest whatever, and where its interests were in no way involved. This was beyond the scope of the authority, not only of the cashier, but also of the board of directors themselves. Nothing short of the unanimous consent of all the stockholders would authorize or ratify such a transaction.

The rights of an indorsee of such paper before maturity, for value, without notice of any vice in its inception, are not involved in this case.

Application denied.