CITIZENS' TRUST CO. v. ABSTON, WYNNE & CO.

(Circuit Court of Appeals, Eighth Circuit. March 19, 1917.)

No. 4543.

BANKS AND BANKING ☞109(3)—REPRESENTATION BY OFFICERS—POWERS OF CASHIER—ISSUANCE OF DRAFTS.

The Missouri Negotiable Instruments Law (Rev. St. Mo. 1909, § 10102 et seq.) provides that an acceptance must be in writing and signed by the drawee, that the drawee is allowed 24 hours after presentation in which to decide whether or not he will accept the bill, but that where he "destroys the same, or refuses within 24 hours after delivery, or within such other period as the holder may allow, to return the bill accepted or nonaccepted to the holder, he will be deemed to have accepted the same." The president and manager of a mercantile corporation, who was also cashier of the bank in which it was a depositor, made a time draft on the bank in its behalf in favor of a holder of the corporation's note, requesting that it be sent direct to the bank for acceptance. This was done, with a request that it be accepted and returned at once. A few days later the payee again wrote, asking to be informed by return mail whether the draft would be returned. It was not returned, but the bank, by the cashier, sent its own draft on a correspondent bank for the amount, which was received by the payee, and the note, which was signed by solvent sureties, was surrendered. Some 2½ years afterwards a receiver for the bank brought suit to recover the money paid on its draft. *Held*, that the action of the bank amounted to an acceptance, which made it the principal debtor on the draft, and that it was bound by the payment.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 260.]

In Error to the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Action at law by the Citizens' Trust Company, as receiver of the Pemiscot County Bank, against Abston, Wynne & Co. Judgment for defendants, and plaintiff brings error. Affirmed.

C. G. Shepard, of Caruthersville, Mo. (Everett Reeves, of Caruthersville, Mo., on the brief), for plaintiff in error.

James H. Malone, of Memphis, Tenn. (A. B. Knipmeyer, of Memphis, Tenn., on the brief), for defendants in error.

Before HOOK and SMITH, Circuit Judges, and REED, District Judge.

PER CURIAM. Caruthersville is the county seat of Pemiscot county, the southeast county of Missouri. The Pemiscot County Bank was organized there, and at the times here material William A. Ward was its president and A. C. Tindle its cashier. Mr. Tindle was a stockholder, president, and general manager of the People's Gin Company and a stockholder in the Missouri Cotton Oil Company and the Tindle

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Cotton Company. He had a heavy interest in the Famous Store Company, which carried a stock of $20,000 in a building of its own worth about $5,000. He was president and a dominating and controlling officer of this company. He also owned a great quantity of land and town property. John H. Poston, Jr., an agent of the defendants, who went to Caruthersville to investigate him and others, reported in October, 1911, that he was worth upwards of $40,000 after deducting all incumbrances, exclusive of his interest in the Pemiscot County Bank and the Famous Store. The defendants were a firm of wholesalers and cotton factors at Memphis, Tenn. In the fall of 1910, Mr. Tindle, acting for the People's Gin Company and the Missouri Cotton Oil Company, made an arrangement with the defendant to advance $7,500 to each of said companies to assist in carrying on their business. Each of the companies gave its note for the amount of advances to it, signed by the company and Mrs. Sallie M. Roberts, Mr. W. H. Johnson, Mr. W. A. Ward, who was president of the Pemiscot County Bank, and Mr. A. C. Tindle, heretofore fully referred to. This money was drawn by drafts on the defendants. These two companies would send products of theirs to the defendant firm for sale and credit. After any consignment had been sold, the net proceeds would be credited to the proper company, and when the notes given matured they were charged to the proper company in its general account.

In 1911 the same system was followed on a more extensive scale. In September, 1912, the defendants loaned the Tindle Cotton Company $20,000 in a similar manner but no additional loans were made this year to the People's Gin Company or to the Missouri Cotton Oil Company. On January 25, 1912, Mr. Tindle was at Memphis, and then on behalf of the People's Gin Company and the Missouri Cotton Oil Company settled their accounts with Abston, Wynne & Co., and gave in the names of the respective companies, two in the name of the People's Gin Company and two in the name of the Missouri Cotton Oil Company, drafts upon the Pemiscot County Bank. These drafts were one drawn by the People's Gin Company for $5,007.62, to be paid February 1, 1912, one drawn by the Missouri Cotton Oil Company for $5,021.91, to be paid February 15, 1912, one drawn by the People's Gin Company for $3,497.61, to be paid March 1, 1912, and one drawn by the Missouri Cotton Oil Company for $2,868.86, to be paid March 15, 1912. That these drafts were all drawn for bona fide indebtedness of the companies drawing them is without dispute. Mr. Tindle did not offer to accept these drafts as cashier of the Pemiscot County Bank, but suggested that they be sent direct to that bank for acceptance.

While it may be negligence to send a draft direct to the drawee for acceptance, there is nothing to indicate that by such negligence the payee will be prejudiced in a suit with the drawee. Abston, Wynne & Co. sent these drafts in a letter, January 25, 1912, in which they said:

"Please accept and return these drafts to us at once."

This letter in all probability reached Caruthersville not later than January 26 or 27, 1912. Who got the letter from the postoffice is not clear. Under date of February 3, 1912, the Pemiscot County Bank, by A. C. Tindle, its cashier, sent to Abston, Wynne & Co. its draft on the

National Bank of Commerce of St. Louis for $5,007.62 in payment of the first draft of the People's Gin Company. On February 5th Abston, Wynne & Co. wrote as if they had not received this remittance to the Pemiscot County Bank referring to these drafts, saying:

"We now ask that you please let us know by return mail whether these drafts will be returned or not."

Apparently later the same day Abston, Wynne & Co. acknowledged to Mr. Tindle the receipt of the draft of $5,007.62 in payment of the People's Gin Company debt and added:

"We cannot understand why the bank does not return us the three other drafts, and wish you would please let us know at once whether or not they are going to do so."

On February 10, 1912, the Pemiscot County Bank, by William A. Ward, its president, sent back the second People's Gin Company draft and the second Missouri Cotton Oil Company draft accepted, and stated they would remit promptly for the first Missouri Cotton Oil Company draft, which was then due in five days, and this they did on February 24, 1912. On July 21, 1914, the Missouri circuit court of Pemiscot county appointed the Citizens' Trust Company as receiver of the Pemiscot County Bank, and on July 29, 1914, it brought this suit, by filing a petition in the state circuit court for Pemiscot county, Mo., seeking to recover the amount paid on the first People's Gin Company draft. The case was removed to the United States District Court for the Eastern District of Missouri, where the parties filed a stipulation waiving a jury, and the case was tried, and the court dismissed the case at plaintiff's cost, and it sued out a writ of error to this court.

It is contended that Ward, the president of the now defunct bank, had signed the People's Gin Company notes for which this draft was given in payment, and that Tindle, the cashier of the bank, had not only signed the notes, but was the president and general manager of the People's Gin Company. There is no room to claim, however, that Ward and Tindle were anything but sureties upon these notes as between them and the People's Gin Company.

It is first insisted that the draft issued on the St. Louis Bank of Commerce was never paid for, and was issued by Tindle in payment of his own debt. Among the powers ordinarily inherent in the position of cashier is that of issuing drafts drawn on his bank's funds on deposit with a correspondent bank. Morse on Banks and Banking (4th Ed.) § 154; Zane on Banks and Banking, § 100.

It will be conceded for the purposes of this case that there is this exception to that rule: That the cashier has no implied authority to issue such drafts in payment of his own debts, and where he issues such a draft to an individual creditor in payment of his individual debt, such creditor, knowing the law, is charged with notice of the apparent lack of authority of the cashier to draw the draft, and in the absence of a showing that the cashier had been expressly authorized to draw the draft or the like for his own debt it would be liable to the bank in an action such as this for money had and received. The question then arises, if he issue a draft, not for the debt of the cashier, but for the

debt of a corporation in which he is a stockholder and managing officer, and upon which debt he is surety, does the same rule apply, and does he have no implied authority to draw a draft in payment on the bank's funds? This identical question was before the Supreme Court of Tennessee in a case between these same parties. Pemiscot County Bank et al. v. Central State Bank et al., 132 Tenn. 152, 177 S. W. 74. In that case the court said:

"In this state of the law, and in this attitude of the court in respect to the doctrine above stated, we are asked to take a step further in advance, and to hold that, where the cashier of a bank issues a draft of his bank on its correspondent, over his signature as cashier, to the collecting bank or agency of a creditor of a mercantile corporation in honoring that corporation's draft or check on the bank, or for a note payable there, the same rule as to imputed notice of embezzlement shall apply. The matter may be presented in sharper outline if, purely for the purpose of test, the case be conceded to be that the draft was drawn directly in favor of Abston, Wynne & Co., as payees, as a way of the Pemiscot County Bank's paying the draft on it issued to the Memphis firm by the Famous Store Company. May the doctrine be fairly or justly extended, so as to hold the Memphis firm to have been put on inquiry as to the cashier's authority by what would thus appear on the face of the bank's draft? In our opinion it cannot, and we are entirely satisfied in declining to so hold.

"The Famous Store Company was an entity distinct from Tindle; it was accepted and dealt with as a customer by the bank as such entity. To the extent that Tindle, as president of the Store Company, controlled its affairs, it would have cast at least a shade of suspicion on the bank in the community, had that company failed or refused to do business with the bank of which Tindle was cashier. It would be an undue stretch to hold that the drawing of a draft on a correspondent city bank by Tindle as cashier in favor of the Store Company or its creditor imparted notice to the creditor on reception that Tindle was unfaithful in his trust as cashier. Abston, Wynne & Co. were not his individual creditors. We must assume, even if Tindle dominated the Store Company, that there were directors and agencies in that company who were true to their trusts, and would refuse to join Tindle in looting the bank in its behalf, and who would, at least in the view of the trading public, operate to deter Tindle from such peculation for that company's benefit. The counsel of the appellee cite no authority which supports such an advanced position; they concede that after diligent search they have been unable to find any.

"It is apparent that appellees must maintain the position that Tindle, as cashier, and therefore as chief executive officer, of the bank, was without power or authority to act in accordance with the usage, practice, and course of business of banking institutions in drawing drafts in favor of corporations in which he was also an officer. Touching the principle bearing upon that point, it was said in Mining Co. v. Bank, 10 Colo. App. 339, 347, 50 Pac. 1055, 1058, as follows: 'It is contended that the note appeared upon its face to be executed by a corporation, and to a corporation of both of which the same person was president, and that this was sufficient notice to put J. B. Wheeler & Co. and each subsequent transferee upon inquiry as to all matters affecting its validity. * * * In any event, the argument depends for its force upon the theory that where a note is executed by one corporation to another, and the same person is president of both, it is prima facie void. These premises are not correct, and the argument therefore falls to the ground. However much such a circumstance may render it obligatory upon a court to scrutinize closely the bona fides of a transaction in certain cases, it by no means follows that it creates a presumption as to the invalidity of the paper, either as to want of authority to execute it, or of consideration. * * * The note did not disclose any suggestion that the maker was without authority to make it, or that it was for the benefit of any one of the officers making it.' See also Cheever v. Pittsburg, etc., R. Co., 150 N. Y. 59,

44 N. E. 701, 34 L. R. A. 69, 55 Am. St. Rep. 646 (cited and quoted with approval in Bank v. Butler, 113 Tenn. 574, 83 S. W. 655), and Orr v. South Amboy, etc., Co., 113 App. Div. 103, 98 N. Y. Supp. 1026.

"To enlarge the above exception to the general rule as to the power of a cashier to issue bank drafts, so as to include in that exception drafts or cashier's checks drawn in favor of such corporations or its creditors, would be to seriously hamper commercial transactions. The settlements made with such paper as exchange vastly exceed in number and amount those made with currency. Sound policy dictates that no further burden be placed by the courts on such paper to the embarrassment of commerce. The free flow and the amplest acceptance by the trading public of such paper should be facilitated by the law, not further embarrassed or hindered. Judge Peckham well said that bank or cashier's drafts are used so enormously at the present time in payment of debts and in settlements that they have almost acquired the characteristics of money, and are regarded by the commercial community as so much cash. True, money bears no 'earmarks' that may give rise to suspicions on the part of the recipient as to the manner in which it was obtained by one who pays it (Thompson v. Clydesdale Bank, [1893] 3 A. C. 202, 69 L. T. N. S. 156; Ball v. Shepard, 202 N. Y. 247, 95 N. E. 719; Goshen Nat. Bank v. State [141 N. Y. 379, 36 N. E. 316], supra), while bank drafts may, as we have observed, still the better policy does not look towards the courts adding to such drafts other marks of dissimilarity to currency. It is more reasonable and just to place upon the directors of a bank the hazard of guarding their institutions from embezzlement by the cashier, who is chosen, and may be caused to be adequately bonded, by them, than to shift the perils incident to his wrongdoing against the institution to the public which is without voice in that regard. Such dishonesty is, fortunately, a thing sporadic, and its results, practically speaking, are confined to a limited territory and to comparatively few persons; whereas, further restrictive rules would affect the currency of such commercial paper, measureless in volume, every business day of the year.

"As was said in Cheever v. Pittsburg, etc., R. Co., supra, in reply to a suggestion that a similar ruling would open an easy way for the perpetration of frauds: 'It is more reasonable and just to assume that corporations will be able to protect themselves by proper vigilance from the dishonesty of their own officers than to impute to parties who have taken the paper for value, ignorant of its origin, constructive knowledge of the facts upon such circumstances as exist in this case.' If the results of delinquency or lack of diligence on the part of the management or supervising agencies of a bank are to be shifted to and borne by the public, then from the standpoint of economics this should be done by way of an undisguised tax levied on the holdings of the public, rather than by way of further depreciating and clouding a medium of exchange so widely in use."

In these days of interlocking officers and directors, now happily passing away, we should be inclined to follow that case, except for a doubt as to whether in effect the case has not been otherwise decided recently. German Savings Bank v. Des Moines National Bank, 122 Iowa, 737, 98 N. W. 606; Ft. Dearborn National Bank v. Seymour, 71 Minn. 81, 73 N. W. 724.

There is another ground upon which it is somewhat more clear to us that plaintiff cannot recover. In 1905 the state of Missouri adopted a negotiable instruments act. This provided (section 10102, Revised Statutes of Missouri 1909):

"The acceptance must be in writing and signed by the drawee."

Section 10106 provides that:

"The drawee is allowed twenty-four hours after presentment in which to decide whether or not he will accept the bill."

Section 10107 provides that:

"Where a drawee to whom a bill is delivered for acceptance destroys the same, or refuse within twenty-four hours after delivery, or within such other period as the holder may allow, to return the bill accepted or nonaccepted to the holder, he will be deemed to have accepted the same."

In Ruling Case Law, vol. 3, p. 1303, it is said:

"It is not to be supposed that, under the Negotiable Instruments Law, a bill can only be accepted by writing signed by the drawee. It is true that verbal and implied acceptances have been abolished by the section which provides that the acceptance must be in writing and signed by the drawee. But the statute also declares that the action of a drawee in destroying a bill or in not returning it, as required by the section, shall be deemed an acceptance of it."

And in 8 Corpus Juris, 303, it is said:

"The Negotiable Instruments Law expressly provides that 'the acceptance must be in writing and signed by the drawee,' and it is held thereunder that an oral acceptance is not binding on the drawee. This provision applies equally well to checks, but does not affect constructive acceptances by delay in returning a bill."

It was held in Wisner v. First National Bank of Gallitzin, 220 Pa. 21, 68 Atl. 955, 17 L. R. A. (N. S.) 1266, that the mere retention of a bill or check for more than 24 hours constituted an acceptance under a statute very similar to the Revised Statutes of Missouri, § 10107. While the statute was largely declaratory of the common law, the question, so far as we can find, has never been before the Supreme Court of Missouri since the enactment of the Negotiable Instruments Law. It was before that court in Rousch v. Duff, 35 Mo. 312, and has been before the Court of Appeals in Dickinson v. Marsh, 57 Mo. App. 566, the latter under substantially the same provision contained in the Negotiable Instruments Act, and it was held that the mere retention of a bill would not constitute acceptance. There are many authorities sustaining this rule under the Negotiable Instruments Act, and, conceding this to be the law, the question is whether the record shows any other acts which, taken with retention, would under section 10107 constitute acceptance.

When the drafts were sent to the Pemiscot County Bank by mail by Abston, Wynne & Co., they did not content themselves with simply sending the drafts, but wrote, "Please accept and return these drafts to us at once." While the bank had remitted for the first People's Gin Company draft under date of Saturday, February 3, 1912, on Monday, February 5, 1912, apparently not having heard from the Pemiscot County Bank, Abston, Wynne & Co. wrote, "We now ask that you please let us know by return mail whether these drafts will be returned or not." Not only did the Pemiscot County Bank remit the amount of the People's Gin Company draft under date of February 3d, but sent in formal written acceptances of the second draft of both the People's Gin Company and the Missouri Cotton Oil Company, but agreed in writing to accept the first Missouri Cotton Oil Com-

pany draft and to pay it when due. The Pemiscot County Bank has never returned or offered to return the draft of the People's Gin Company on it to Abston, Wynne & Co., although repeated demands have been made upon them to do so. These circumstances all show that it accepted the draft within the meaning of the Missouri statute. So far is this true that it is practically conceded by plaintiff in error who say in their brief:

"In January, 1912, the defendants were insisting on payment of the notes which they held made by the People's Gin Co., and indorsed by Wm. A. Ward, A. C. Tindle, Sallie M. Roberts, and W. H. Johnston, and Tindle went to Memphis, and in settlement of the amount due on the note of the People's Gin Co., as aforesaid, made to them time acceptances on the Pemiscot County Bank, signed by the People's Gin Company, by A. C. Tindle, president, and requested the defendants to send the acceptances direct to the Pemiscot County Bank for acceptance, which was accordingly done, and Wm. A. Ward, as president of the Pemiscot County Bank, accepted the time draft so drawn on the Pemiscot County Bank in payment of the notes made by the People's Gin Co."

The case is therefore argued upon the theory that the draft in question was drawn in payment of a draft accepted by the Pemiscot County Bank. Assuming this to be true, the instant the bank accepted this bill drawn on it by the People's Gin Company, it became the principal debtor thereon. Wallace v. McConnell, 13 Pet. 136, 10 L. Ed. 95; Superior City v. Ripley, 138 U. S. 93, 11 Sup. Ct. 288, 34 L. Ed. 914. And the issuance of a draft on its St. Louis correspondent by its cashier was in payment of its own debt, and not the debt of any other person, and was clearly within the powers of the cashier.

It is perhaps proper here to say that the counsel for the plaintiff below said:

"It is admitted here by the plaintiff that the proof in the case does not show any fraud, any actual fraud, on the part of these defendants, in that the proof does not show that they had any notice of Tindle's defalcation, if there were any, with the Pemiscot County Bank."

The long delay in assailing the transactions of nearly 2½ years, and the fact that the bank kept the draft and has never offered to return it to this day, and that, in reliance on the conduct of the bank, Abston, Wynne & Co. surrendered the notes they held for the amount, signed by Mrs. Sallie M. Roberts, who was amply good and had more wealth than all the other signers, and their settlement with her as to the balance on which she was surety, might establish the defense of laches or of an estoppel outside of laches; but the sole answer in this case is a general denial, and these defenses cannot be considered.

Upon the grounds already indicated, the judgment of the District Court was correct, and it is affirmed.