## LIVE STOCK STATE BANK v. FIRST NAT. BANK OF FAIRFIELD, IDAHO, et al.

### (District Court, D. Idaho, S. D. February 29, 1924.)

#### No. 1038.

1. **Banks and banking ☞262—Cashier cannot, with one having knowledge, bind bank to his benefit and its injury.**

   Any secret agreement of the cashier of defendant bank, on which plaintiff bank made a loan to a company of which the cashier was part owner, that on maturity of the company's note it could be charged to defendant, was not binding on defendant; plaintiff knowing at the time of the cashier's interest in the company to which the money was going, and that defendant could receive no actual benefit.

2. **Banks and banking ☞269—Secret agreement to conceal excessive loan, fraudulent as to stockholders and creditors.**

   If, to aid defendant bank to loan to a company more than the National Banking Law allowed, plaintiff took company's note directly to plaintiff, with secret agreement that defendant should be liable thereon as for a note rediscounted by plaintiff for defendant, such agreement was fraudulent, not only against the Comptroller of the Currency, but also defendant's stockholders and creditors, so that it is not liable thereon.

At Law. Action by the Live Stock State Bank against the First National Bank of Fairfield, Idaho, and C. C. Still, its receiver. Complaint dismissed, and judgment on cross-complaint for defendant receiver.

Carey & Kerr, of Portland, Or., Karl Paine, of Boise, Idaho, and Charles A. Hart, of Portland, Or., for plaintiff.

---

Sullivan & Sullivan, of Boise, Idaho, and J. W. Edgerton, of Pocatello, Idaho, for defendants.

·DIETRICH, District Judge. The plaintiff prays judgment against the defendants for approximately $17,000. Defendants resist, and in turn ask judgment against the plaintiff for approximately $3,000. The controlling question is the liability of the defendant bank upon an outstanding note for $20,000 given by the Rocking "H" Live Stock Company to the plaintiff bank. The plaintiff has credited upon this note approximately $3,000, the amount due the defendant bank upon an open account, and now seeks to recover the balance. Defendants deny all liability upon the note and demand the amount of their open account. Jury is waived.

The plaintiff is a state bank, organized under the laws of Oregon, and doing business at Portland. It has a capital stock of $100,000, and during the period in question had a surplus of approximately $25,-000. Under the law it could legitimately loan to a single person or corporation not to exceed 20 per cent. of its capital and surplus. Closely allied to it was the Portland Cattle Loan Company, a corporation; its president was also president of the loan company, and its cashier was a vice president of that company, and apparently there were other interlocking relations.

The defendant bank was a national bank doing business at Fairfield, Idaho, having a capital stock of $25,000 and a surplus of approximately $12,000. Its active executive head was one. G. A. Horal, for a while its cashier and later its president. Extensively engaged in cattle raising in the same community was the Rocking "H" Live Stock Company, a. corporation, owned by three persons, including Horal, who was its secretary and treasurer, and its responsible financial manager. One of the other two owners was, during a part of the period in question, also the president of the defendant bank. The Live Stock Company was a heavy borrower from the Portland Cattle Loan Company, the amount of the borrowings in 1917, the beginning of the period under consideration, being approximately $190,000, and this was secured by a chattel mortgage upon the debtor's cattle herds. The Fairfield bank carried an account with the plaintiff bank. At all times Horal's interest in and relation to the Rocking "H" Company was fully known to the plaintiff bank. Though borrowing heavily from the cattle loan company, the Rocking "H" Company was short of funds for current expenses in running and feeding its herds, and accordingly, early in 1918, a loan of $30,000 was arranged with the plaintiff bank. For some reason, not entirely clear, but apparently for the purpose of avoiding the appearance of an excess loan, the loan was split so that one note was taken directly from the Rocking "H" Company for $20,000, and another note from Housman and Rubottom, two of the owners. The note from the company was also indorsed and guaranteed by Rubottom and Horal. But, as was understood upon all hands, the transaction was a single one and the entire $30,000 was for the benefit of the Rocking "H" Company, and was in fact used by it in running and caring for its live stock, upon which, as we have seen, the Portland Loan Company had a chattel mortgage. There

were three or four renewals, but the form and purpose of the loan remained without substantial change. All the notes were on forms of the plaintiff bank, and were payable to its order. Neither upon their face, nor by indorsement, did they disclose any connection whatsoever with the Fairfield bank.

The Fairfield bank closed for business on June 19, 1920, and in due time the defendant Sill became and now is receiver thereof, engaged in winding up its affairs under the direction of the Comptroller. In the meantime apparently the note for $10,000 was paid. The other note for $20,000, signed by the Rocking "H" Company, and guaranteed by Rubottom and Horal, fell due on June 1, 1920, and, not being paid, the plaintiff charged it to the account of the Fairfield Bank and sent it to that bank, after having indorsed it without recourse. Disclaiming liability, the Fairfield bank declined to accept it, and returned it to the plaintiff. Also disclaiming liability, the receiver rejected the plaintiff's claim, and hence this suit.

Admittedly, plaintiff's contention that the Fairfield bank is liable rests upon no indorsement or written agreement or other undertaking signed by that bank. True, plaintiff offered in evidence a letter written by Horal, president of the Fairfield bank, of date January 9, 1920, purporting to authorize it to charge at maturity any note that it was "carrying for us"; but, even if it should be conceded that the terms of this letter are broad enough to embrace such a note as this, in which the Fairfield bank had no interest (a construction difficult to adopt), for various legal reasons such an agreement or undertaking would be unenforceable against the Fairfield bank, and when the letter was offered counsel for the plaintiff expressly disclaimed reliance upon it as a substantive agreement. (Two rulings were made as to the reception of this letter in evidence, apparently inconsistent. That there may be no misunderstanding, it is now stated that it is deemed to be in evidence.) It is also conceded that the note was not held as "rediscount paper"; it was executed and delivered directly to the plaintiff, the payee named therein.

Plaintiff relies upon some sort of a secret oral understanding had, in the fall of 1917, between Horal, who, as we have seen, was the active head of both the Fairfield bank and the Rocking "H" Company, and T. J. Mahoney, who was both cashier of the plaintiff bank and a vice president of the Portland Cattle Loan Company, and also upon the "course of dealing" between the two banks, as disclosed by correspondence and other records, particularly the books of the plaintiff bank. Briefly stated, its position is that for certain general considerations the Fairfield bank agreed and undertook that, upon the maturity of these as well as other notes referred to in the record, the plaintiff might charge them to its account. Of the voluminous correspondence, it must suffice to say generally that if we were to put aside the fact of Horal's relation to the Rocking "H" Company, there is much in it tending to support this position. The books of the bank are highly equivocal. The only heading of the so-called liability account is "Fairfield Notes," and while these notes, together with numerous others coming from Fairfield, were entered under this heading, for some reason, not satisfactorily explained, they were the subject

of a measure of distinctive treatment. Turning to the records of the Fairfield bank, we find no entries whatsoever referring to the notes; and the correspondence in question was largely with Horal, and handled by him alone. No one connected with this bank, either as an officer or employee, other than Horal, ever knew that it was interested in or had any responsibility touching the notes. No one connected with the Rocking "H" Company, unless it be Horal, had any knowledge or information or thought that the defendant bank had any interest or responsibility, or that the Portland bank was making such a claim.

For its proof of the alleged agreement between Horal and Mahoney plaintiff relies upon the somewhat vague and unsatisfactory testimony of the latter, and even he does not expressly testify that the understanding covered notes such as the ones in controversy; and strangely enough, if there was such an agreement, Horal's letter of January 8, 1918, apparently confirmatory of such oral agreement as had been had, fails to mention this feature. And again, if such an agreement was had in the fall of 1917, as claimed, and it was consistently acted upon thereafter, why did plaintiff insist upon the Horal letter or agreement of January 9, 1920, which purports to be a new undertaking, and not the confirmation of a pre-existing one? But even more significant, if not conclusive against the plaintiff's contention, is a report made by plaintiff's cashier in June, 1919, while a note, of which the one in controversy is but a renewal, was outstanding. This report was made to the chief National Bank Examiner at San Francisco, in response to an inquiry sent out for the purpose of enabling his department to check up the affairs of the Fairfield bank. Among the written questions submitted to the plaintiff bank were the following:

"1. Rediscounts. Did your bank on the above date of examination hold any bills receivable of the above bank, purchased or discounted by your bank, bearing the official indorsement of the bank under examination, or for which it was in any way liable? If so, please furnish a list giving names and amounts."

"4. Repurchase Agreement. Did your bank on above date hold any securities or bills receivable taken from above bank or from any of its officers, under an agreement or understanding to repurchase by it at a future date, or under written or oral authority to charge them to the above-named bank? If so, give detailed list, with particulars."

To each of these questions, the plaintiff, through its cashier, answered, "None." That the answers were wholly inconsistent with plaintiff's present contention is conceded. While Mahoney was not then the cashier, he was still an officer of the bank, and it is hardly credible that, if he had had such an important oral understanding with the Fairfield bank, he would not have communicated it to his associates, or that his successor would have been left in ignorance thereof.

But, aside from that consideration, plaintiff's main reliance now is, not upon the oral agreement between Mahoney and Horal, but upon what is contended to be disclosures of its books and its correspondence files, to all of which the cashier, at the time he made this report, had access, and to which presumably he referred before making so important a report. We are put to the alternative of concluding that either plaintiff, through its cashier, deliberately made false answers to

the examiner, or at that time construed its books and files as not disclosing any such understanding or course of business as it now asserts. The latter view seems the more reasonable.

[1] While, therefore, I am inclined to think that, until some time after the last note in question was executed, neither the plaintiff bank nor the defendant bank understood that there was any real liability on the part of the Fairfield institution, let us consider certain legal aspects of the controversy upon the assumption that Horal did intend and attempt, on behalf of the Fairfield bank, to make and act upon such an agreement. Manifestly no analogy is found in the decided cases cited for the plaintiff, where a bank officer, with no private interest to be subserved, and within the apparent scope of his authority, but without actual authority, or possibly in violation of the positive instructions of his superiors, has engaged in a transaction with another bank or other person from which his bank has received a benefit which it retains. The Fairfield bank received no benefit from this loan, at least nothing specific or tangible. True, some of the notes, after being executed at Fairfield, were forwarded to Portland with a letter of transmittal written upon the stationery of the Fairfield bank, and signed by Horal, cashier or president, as the case may be; but, as already stated, the notes were all upon the forms of the Portland bank, and made payable to it, and were neither indorsed by the Fairfield bank nor entered upon its books. Also, in turn, Horal was advised by the Portland bank of a credit of the amount of the notes, but, as was to be and doubtless was expected, this was simply passed as a credit to the Rocking "H" checking account in the Fairfield bank. The Fairfield bank acted only as an intermediary between the Portland bank and the Rocking "H" Company. The notes of the latter were turned over to the Portland bank, and the consideration therefor from the Portland bank it delivered by a credit of the amount to the account of the company. The result would have been precisely the same if it had received from the Portland bank cash or a check in the amount of $30,000, and this it had turned over to the Rocking "H" Company, and this company in turn had deposited the amount for credit to its account.

The other outstanding feature of the transaction, taking plaintiff's version of it, is that Horal, while ostensibly acting for the bank, was in fact, as plaintiff well knew, furthering his own private interests. The relation of a bank officer to his bank is highly fiduciary; he performs a very sacred trust, requiring undivided allegiance. With one having knowledge of his private interest, he can make no binding obligation for his bank to his benefit and to its injury. Plaintiff knew of Horal's interest in the Rocking "H" Company, and knew that the money was going to that company, to care for property in which its closely allied concern, the Portland Loan Company, was heavily interested, and knew that the defendant bank could and would receive no actual benefit. Suppose that the $30,000 had been loaned to Horal personally upon his note, but with a secret agreement, as here claimed, that upon maturity of the note it might be charged to the Fairfield bank, would any one suggest the validity of such an agreement? But

the supposed case differs from the one here only in degree; the principle is the same. Accordingly, the alleged agreement is held to be void.

"The broadest possible authority to make and indorse paper presumptively is to be exercised in the principal's interest, and does not impliedly extend to making or indorsing paper for the accommodation of third persons, and still less for the agent himself." 2 C. J. 642; 21 R. C. L. 824; 31 Cyc. 1432.

"While the acts of a cashier of a bank performed within the scope of his duties are ordinarily binding upon the bank, it is well settled that, where a third person deals with the officer of a bank in a matter in which the officer is personally interested, the officer then acts in a dual and inconsistent capacity, and his acts are not binding upon the bank." Florida Nat. Bank v. Merchants' & Farmers' Bank (D. C.) 227 Fed. 715.

"But, on the other hand, the stockholders and directors of banks, especially small banks, must rely on the honesty of their executive officers, and they have a right to demand that other banks shall not blindly disregard plain evidences that a president or cashier is acting for himself or some other person while using the bank's name and credit. True, the national bank in the conduct of its general business held Dean out as its agent, but the implied authority fell from him as soon as his antagonistic interest appeared." First Nat. Bank v. Drovers' & Mechanics' Nat. Bank, 244 Fed. 135, 156 C. C. A. 563.

See Ft. Dearborn Nat. Bank v. Seymour et al., 71 Minn. 81, 73 N. W. 724; West St. Louis Savings Bank v. Parmalee, 95 U. S. 557, 24 L. Ed. 490; Moores v. Citizens' Nat. Bank (C. C.) 15 Fed. 141, affirmed 111 U. S. 156, 4 Sup. Ct. 345, 28 L. Ed. 385; U. S. Nat. Bank v. Bank, 64 Fed. 988, 13 C. C. A. 472; St. Nat. Bank of St. Joseph v. National Bank, 66 Fed. 691, 14 C. C. A. 61; Park Hotel Co. v. Fourth Nat. Bank, 86 Fed. 742, 30 C. C. A. 409; National Bank of Seattle v. Titlow (D. C.) 233 Fed. 841; Sponge Exch. Bank v. Com. Credit Co. (C. C. A.) 263 Fed. 21; Wells Co. v. Avon Mills (C. C.) 118 Fed. 195; McLellan v. Detroit File Works, 56 Mich. 579, 23 N. W. 322; Bank of N. Y. N. B. Ass'n v. A. D. & T. Co., 143 N. Y. 559, 38 N. E. 713; Kenyon R. Co. v. Nat. Dept. Bank, 140 Ky. 133, 130 S. W. 965, 31 L. R. A. (N. S.) 169; Ellis v. Citizens' Nat. Bank, 25 N. M. 319, 183 Pac. 34, 6 A. L. R. 166.

[2] In another aspect: If we were to adopt plaintiff's theory, with its necessary implications, and accordingly assume that in effect the Fairfield bank made the loan to the Rocking "H" Company, and rediscounted the paper by indorsement to the plaintiff bank, there would be but one rational explanation of the devious course pursued, and that is that Horal and the plaintiff bank deliberately entered into a scheme to violate the national banking laws. Plaintiff was carrying numerous other notes for the customers of the Fairfield bank, all executed upon the latter's forms, and payable to its order, and indorsed to and rediscounted by the Portland bank, and they were entered upon the books of the Fairfield bank, where all persons interested, including the Comptroller and his agents, could ascertain the real nature of the transaction. That is the usual course of legitimate banking. But a loan of $30,000 or $20,000, or even $10,000, could not lawfully be made by the Fairfield bank to the Rocking "H" Company. The wholesome limitation established by the federal statutes must be cir-

cumvented, and hence the sinuous, under cover course of procedure. Business institutions of large affairs and numerous transactions do not withhold the details thereof from their books, and commit to secret oral understandings the evidence of important rights and obligations, unless there is cogent reason for concealment. That the cashier of the plaintiff was ready to join with Horal in evading the limitations of the law is made plain in a letter written by him to Horal on April 26, 1918, in which he suggests:

"We would prefer taking from your bank your C. D. for $10,000 or $15,000, or, if you do not want it to show under 'Bills Payable,' suppose you send us for rediscount some of your sheep and cattle paper. We will take $10,000 or $15,000 of your customers' notes, which *you can indorse without recourse, writing us in a separate letter' that we can charge them to your account at maturity, and they need not show on your statement as bills payable or rediscounts.*"

Only by assuming a scheme of like character to that proposed in this letter can we account for the secret understanding between Mahoney and Horal, upon which plaintiff relies, if such understanding was had at all. And plainly stated, then, this is the case upon which plaintiff comes into court and asks for relief: Under the law the maximum loan the Fairfield bank could make to any one person was $3,750. To circumvent the wholesome limitation of the law, the plaintiff entered into a secret agreement with Horal, by which, for his benefit, indirectly, but in effect, his bank loaned eight times its maximum capacity, and assumed an obligation greatly exceeding its entire capital; a secret agreement, the purpose of which was to withhold from the Comptroller of the Currency knowledge of a most vicious excess loan, and the natural result of which was to conceal the true nature of the transaction and the true condition of the Fairfield bank from its stockholders and depositors and officers other than Horal. Through such secret understanding, and by withholding the transaction from the books of the Fairfield bank, not only did plaintiff plan to deceive, but subsequently, as we have seen, when the Comptroller, through his Chief Examiner, sought information of the plaintiff bank, it affirmatively deceived him by giving untrue answers.

Without further discussion, it is held that the alleged agreement, if made, was immoral, contrary to public policy, and fraudulent as against the Comptroller of the Currency, as well as the stockholders and depositors of the bank. Were the consideration material, it cannot be said that the wrong is chargeable only to the cashier of the plaintiff bank. All of its officers having to do with its loans and discounts must have known and acquiesced. Upon their face the notes showed no connection whatsoever with the Fairfield bank, and there was no indorsement or other writing. Hence, if, as contended, the claim was always made by the plaintiff bank of responsibility on the part of the Fairfield bank, such claim must have rested in the minds of those asserting it upon the supposed oral agreement.

Plaintiff requests a finding that "the $20,000 note of the Rocking "H" Company was a note carried for the Fairfield bank by the Live Stock State Bank, under an agreement by which it was to be charged back at maturity, and that the Fairfield bank, on the strength of that

agreement, actually secured the face of the note, $20,000." As a whole, the proposition is complex and not altogether clear; but, as I understand it, I find that the Fairfield bank did not make such an agreement, and did not secure $20,000, or any part thereof—that is, it did not get it for itself, nor did it receive any benefit therefrom.

Plaintiff's complaint is dismissed, and judgment to the defendant receiver as prayed in the answer or cross-complaint.