**LABOR DISCOUNT CENTER, INC.,**
**Plaintiff-Appellant,**

v.

**STATE BANK & TRUST COMPANY OF WELLSTON (now named First State Bank & Trust Company), et al., Defendants-Respondents.**

No. 35229.

Missouri Court of Appeals,
St. Louis District.

May 20, 1975.

Motion for Rehearing or Transfer
Denied June 26, 1975.

Application to Transfer Denied
Sept. 8, 1975.

William H. Wyne, Jr., St. Louis, Leonard R. Yocum, Clayton, Leo F. Laughren, St. Louis, for plaintiff-appellant.

Philip Gallop, St. Louis, for St. Bank & No. Co. Bank.

Jesse Bishop, St. Louis, for Am. Nat. Bank, Brentwood Bank & City Bank.

Thompson, Walther, Shewmaker & Gaebe, Martin E. Galt, III, St. Louis, for Mercantile Tr. Co. N. A.

Hyman G. Stein, Bernard J. Mellman, St. Louis, for Morris A. Shenker.

PER CURIAM.

## I.

### Introduction

This action is an off-shoot of litigation which began as a suit filed by H. B. Deal Construction Company for the purpose of impressing a mechanic's lien in the amount of $178,182.80 on realty owned by the Labor Discount Center, Inc., located at 1795 Dunn Road in St. Louis County. Labor Discount (hereinafter referred to as plaintiff in this litigation) one of the defendants in the H. B. Deal suit filed its cross-petition against six banks, co-defendants in the mechanic's lien suit, and against four individuals—Mr. Morris A. Shenker and his wife, Lillian, and Mr. Jacob Wittels and his wife, Bertha. The six banks named by Labor Discount as cross-defendants are (1) the State Bank and Trust Company of Wellston (now known as the First State Bank and Trust Company

and hereinafter referred to as the State Bank), (2) North County Bank and Trust Company, (3) Security Trust Company (which was merged into Mercantile Trust Company National Association and hereinafter referred to as Security Trust Company), (4) American National Bank in St. Louis, (5) Brentwood Bank and (6) City Bank.

## II.

*The Development of Labor Discount Center and The Financial Arrangements*

There were many facts adduced by all parties at trial. Many were not in dispute, and those we shall set forth initially.

Sometime in 1960 or 1961, Stephen M. Lumetta conceived of an idea for a discount store to be located in north St. Louis County which would specifically cater to the working man. As a first step in bringing his concept into being, Labor Discount Center, Inc. was incorporated sometime in 1961. In 1962, the stockholders of record of that corporation consisted of Paul Lumetta, Stephen's brother, Morris A. Shenker, Jacob Wittels, Mrs. Gertrude Krost, and Mr. James Nangle. Paul Lumetta, president of the corporation, owned 52½% of the stock of the corporation, and Mr. Shenker and Mr. Wittels, 40%. To make his concept viable, Stephen Lumetta and the corporation needed two things: (1) land on which to construct the discount store and (2) money to pay for the land and the construction of the discount center. With respect to his land needs, Mr. Stephen Lumetta settled on a tract of land situated in an unincorporated area of north St. Louis County, subsequently known as 1795 Dunn Road, consisting of 105.89 acres. The purchase of the tract of land was accomplished through Stephen Lumetta's attorney, Mr. Shenker, with the aid of mortgages held by both Mr. Shenker and the Security Trust Company in an aggregate sum of $535,000.00. A deed of trust for $655,000.00 was placed on the property. By various quit-claim deeds from

Mr. Shenker and Lillian Shenker, Mr. Wittels and Bertha Wittels, and McDaniel Motor Company, Inc., title to the land was conveyed to the plaintiff corporation on November 29, 1962.

Rezoning for commercial use of thirty acres of the tract was then effected. An architectural firm, Schmidt, Black and Perlsen, prepared plans for the building. Construction bids were sought, and on December 5, 1962, the plaintiff entered into a construction contract with the successful bidder—H. B. Deal Construction Company—for the construction of a building in accordance with the plans and specifications of the architectural firm for a guaranteed price of $1,250,000.00 which included a fixed contractor's fee of $50,000.00.

Having acquired the land and having contracted for construction of the discount center, Stephen Lumetta undertook to obtain financing. He made application to the Central States, Southeast and Southwest Areas Teamster's Pension Fund in Chicago, Illinois, for $2,500,000.00 for permanent financing. On October 15, 1962, the Trustees of the Pension Fund approved a commitment of $1,666,000.00 for permanent financing "when said real estate is improved with a structure or structures which will be used as a discount house and shopping center." The commitment contained numerous other requirements relating to (1) title, (2) method and quality of construction, (3) certification of compliance therewith by the Real Estate Research Corporation, (4) execution of a note in conformity with the payment provisions contained in the commitment to be secured by a merchantible first mortgage on the real estate and the improvements constructed thereon, (5) a mortgage guarantee policy, and (6), which later became critical, the right of revocation of the commitment in the event the borrower, Labor Discount, filed or had filed against it a petition for bankruptcy. It further provided that there should be a single payout of the loan, disbursement thereof to be "no sooner than January 1, 1964, and no later

than June 1, 1964." Interest was 6½% per annum, and the loan was payable in 240 monthly installments of $12,421.25 each to commence "thirty (30) days from the date of the disbursement of our loan proceeds." At the time of acceptance of the commitment, a nonrefundable service fee of $16,-660.00 was to be paid the Pension Fund. The commitment was non-assignable except to a bank or insurance company or other institutional lender for the purpose of interim financing.

Armed with this commitment for permanent financing, from the Pension Fund, a meeting was arranged with Mr. Frank Chervitz, Executive-Vice President of State Bank, on December 10, 1962, for the purpose of obtaining interim financing. At this meeting were Stephen M. Lumetta representing the plaintiff, Mr. Chervitz, Mr. William Borders and Mr. Carl Sydow of Security Trust Company, Mr. Shenker, Jacob and Malcolm Wittels, William J. Waldorf, and James Nangle. At this meeting it was decided that about $1,900,000.00 would be needed "to get the thing off the ground," and that amount of interim financing was agreed upon. It was explained to Stephen Lumetta that State Bank would be "the lead bank," i. e., the bank which would administer the loan, disburse the amounts loaned, take and hold the collateral, take notes from the borrower, obtain from each "participating bank" its share of each disbursement, issue to each of the participating banks, other than itself, a participation certificate, collect the interest and distribute it among the participating banks. At the time of this meeting Mr. Chervitz did not know who the participating banks would be. Stephen Lumetta was also advised that all of his dealings were to be with Mr. Chervitz. Two days later, by letter of December 12, 1962, Carl Sydow, the vice-president of Security Trust Company, suggested to Mr. Chervitz that an assignment of the commitment of the Pension Fund should be obtained from Labor Discount so that the Pension Fund would know of the assignment and so that none of the terms of the commitment could be changed without the consent of the assignee banks.

The banks' agreement to loan $1,900,-000.00 for interim financing for construction of the building was then prepared and executed. This agreement, on the letterhead of State Bank and directed to "Labor Discount Center, Inc. c/o Mr. Paul Lumetta, President," is dated December 18, 1962. It confirms that the six banks would lend "for construction funds" $1,900,000.00 in specified proportions of participation.[1] The commitment contained no provision for the use of any part of the $1,900,000.00 for "furnishings" or "equipment," but in paragraph 11 of the banks' commitment, it was provided that:

"It is further understood and agreed by and between the parties hereto and by Morris A. Shenker and Lillian Shenker, his wife, and by Jacob M. Wittels and Bertha Wittels, his wife, as evidenced by their signatures hereto, that *if necessary and in order to complete the improvements and furnishings and equipment in accordance with the plans and specifications* that Morris A. Shenker and Lillian Shenker, his wife, will *upon demand of the undersigned Banks* advance amounts up to Fifty Thousand ($50,000.00) Dollars, and that Jacob M. Wittels and Bertha Wittels, his wife, will *upon demand of the undersigned Banks* advance amounts up to Fifty Thousand ($50,000.00) Dollars." (Emphasis supplied.)

1. Exhibit B provided that the Banks would participate in the loan as follows:

| | | |
|---|---|---|
| State Bank | $499,890.00 | 26.31% |
| Security Trust Company | 700,530.00 | 36.87% |
| North County Bank & Trust Co. | 119,890.00 | 6.31% |
| American National Bank in St. Louis | 174,990.00 | 9.21% |
| The Brentwood Bank | 299,820.00 | 15.78% |
| City Bank | 104,880.00 | 5.52% |

The commitment letter from the banks required that the realty was not to be directly mortgaged to secure the advances by the banks, but a $2,000,000.00 note secured by the first deed of trust on the Dunn Road property was to be executed by the plaintiff and delivered to the banks to secure the indebtedness, thereby constituting collateral security for the loans. There was also a second deed of trust held by State Bank for a loan of $175,000.00, which State Bank had loaned plaintiff under a separate agreement.

As required by the construction contract, H. B. Deal, the contractor, the plaintiff and State Bank, as the "mortgagee," entered into a "Construction and Disbursing Escrow Agreement" with General Title Service Corporation, whereby it was provided that all monthly requests for payments were to be signed jointly by an authorized representative of Deal and by either Stephen or Paul Lumetta as authorized representative of plaintiff. There were a number of other documents executed in connection with the Escrow Agreement, but for our purposes it is not necessary that we set them out in this opinion. The $2,000,000.00 note and deed of trust—which is the note and deed of trust which was subsequently foreclosed—was made payable to Charles W. Sunderman.[2] He was named as the beneficiary of the deed of trust. Plaintiff assigned the Pension Fund commitment under date of December 18, 1962, to State Bank and the Pension Fund acknowledged this assignment by letter of January 31, 1963.

Work got under way on the discount center sometime around December 3, 1962. As construction progressed, changes in the original plans and specifications were made. In all, 52 change orders were made, some resulting in decreases rather than increases in cost, but the grand total of all of these change orders came to an increase of $250,-373.71.

Sometime during the course of construction, between April and June, 1963, it became apparent to Stephen Lumetta that additional interim financing was going to be necessary to complete the job. He commenced discussions with Mr. Chervitz concerning additional funding. It is these discussions that form the basis of this lawsuit. He inquired whether Mr. Chervitz could increase the second deed of trust, but Mr. Chervitz advised him that he would not. It is at this point that the evidence becomes conflicting.

According to the testimony of Stephen Lumetta, sometime "around the month of June, and July, including August"—Mr. Chervitz said that he would increase the interm financing by the increased portion of the Pension Fund commitment ($734,-000.00) which had been applied for, and send it to the Title Service Company to pay off the construction and other items. According to the plaintiff's evidence, Mr. Chervitz told Stephen Lumetta that if he was able to obtain an additional amount of money from the Pension Fund in an amount in excess of what he had already agreed to lend for construction purposes, then he would lend this amount or additional amounts to match the increased amount obtained from the Pension Fund for construction purposes. The amount of additional money they were talking about, according to Stephen Lumetta, was $500,-000.00.

Mr. Chervitz, on the other hand, testified that he declined to increase the second deed of trust held by State Bank on the permanent commitment and likewise declined the request for additional interim financing, because, inter alia, the bank had already reached the maximum of its loan limits. Mr. Chervitz testified that he did, however, advise Stephen Lumetta that if he were in his place he would go to the Pension Fund and ask for an additional amendment to the

2. Mr. Sunderman was an officer of State Bank, and A. L. Uebel, named as trustee in the deed of trust, was likewise an officer of State Bank.

original commitment ($1,666,000.00) for additional money, and try to get the fund to close as quickly as possible so he would have funds available.

On July 2, 1963, H. B. Deal sent the Title Company a copy of each of the first twelve change orders and pointed out savings of $56,035.00 in the cost of the project as contracted for.

In the interim, seven draws had been made against the $1,900,000.00 loan commitment of the banks, totalling as of August, 1963, $1,504,000.00. On August 30, 1963, plaintiff sent its application to the Pension Fund asking that the original commitment be increased by $734,000.00, or to a total of $2,400,000.00. Plaintiff made several "draws," and by October, 1963, these draws aggregated $1,900,000.00, the amount of the banks' commitment.

Labor Discount opened for business on October 24, 1963. After opening, plaintiff started receiving rentals from lessees.

On December 18, 1963, the Pension Fund notified plaintiff by letter that its application for the amended permanent financing commitment applied for August 30, 1963, had been approved, and the permanent financing commitment was increased to $2,400,000.00.

On January 9, 1964, Stephen Lumetta took this amended commitment of the Pension Fund to Mr. Chervitz. An assignment to the bank was prepared and executed by Paul Lumetta. At this time also State Bank made a separate loan to plaintiff in the sum of $59,289.81.

Plaintiff offered evidence to the effect that during the latter part of 1963 and the first part of 1964, Mr. Chervitz had numerous conversations with Stephen Lumetta about the financing of the construction and various subcontractors began contacting Stephen Lumetta about payment. They were advised to contact Mr. Chervitz. Mr. Jarrell, one of the subcontractors, and Mr. Deal testified that Mr. Chervitz told them that as soon as the increased commitment came through, the bank would increase its construction loan. But Mr. Chervitz denied this. Mr. Jarrell testified that he talked with Mr. Chervitz about being paid for his heating and airconditioning bill and Mr. Chervitz told him that the additional commitment was coming through and to "go ahead and finish the extras." Mr. William L. Dowling, an insurance agent for Ploesser & Watts, Inc., an insurance agency, who handled the insurance on the property, testified that he talked with Mr. Chervitz and Mr. Souris, also of State Bank, and both told him there would be funds to pay the past due insurance premiums. Two other witnesses, Messrs. Gilinsky and Sherman, both connected with Sales Communications, Inc., testified as to conversations with Mr. Chervitz, about their bill. Mr. Gilinsky said that in a conversation in 1963, Mr. Chervitz said that they "would probably" be getting paid in the not too distant future and that again in 1964, when they were still trying to get paid, Mr. Chervitz, "in a kind of off-hand manner," said that perhaps they could file, or get someone to file, an involuntary bankruptcy proceeding. Mr. Sherman, who was not produced as a witness until rebuttal, testified that Mr. Chervitz introduced him to a man from the Metropolitan Guard Service at the State Bank's offices and told him that "the man" had proceeded with involuntary bankruptcy proceedings and it looked like he ought to join therein to protect his interest.

Defendants contend that the statements of Mr. Chervitz were misconstrued, and what he was referring to when he talked with these persons was not that additional funds would be put forth by the banks, but rather that funds would be available to the plaintiff upon the closing of the permanent financing loan with the Pension Fund, which could be achieved on January 15, 1964, or shortly thereafter.

State Bank through its attorney, Mr. Gallop, took steps to close the permanent loan

with the Pension Fund. Mr. Gallop met with representatives of the other banks, Stephen Lumetta and James Nangle for this purpose, and finally on May 14, 1964, prevailed upon Stephen Lumetta to notify the Pension Fund of its readiness to close. In the meantime, certain mechanics' liens were filed against the property, and, on May 20, 1964, H. B. Deal filed its suit to enforce its mechanic's lien. But prior thereto, on March 12, 1964, a meeting was held at State Bank as a result of a letter of March 7, 1964, from plaintiff to the State Bank demanding either advancement of the additional funds or release of the assignment of the Pension Fund commitment, so that plaintiff could reassign the right to the additional funds to another party. At this meeting, Stephen Lumetta discharged Mr. Shenker as plaintiff's attorney. Those in attendance were advised that Mr. Gochenour was to be the plaintiff's lawyer thereafter. Further efforts were made by Mr. Gallop, Mr. Nangle and Mr. Gochenour to prevail upon the creditors to reduce their claims and there were discussions about leasing the discount center to GEM International, Inc., but this proposal was rejected at a stockholders' meeting of plaintiff. Plaintiff admittedly made no effort to obtain any interim financing from any other source.

When the plaintiff, on May 14, 1964, notified the Pension Fund that it was ready to close the loan, there were still some requirements of the commitment which had not been met. The Pension Fund extended the time for closing to July 10, 1964, but on July 6, 1964, three general creditors of plaintiff filed an involuntary bankruptcy petition against it, and the Pension Fund as a result, on July 7, 1964, pursuant to the clause in the commitment authorizing it to do so, revoked and canceled its commitment.[3]

On September 30, 1964, the $2,000,000.00 note made by plaintiff was sold to the banks at foreclosure. The banks then proceeded with the foreclosure of the deed of trust securing the note and sold the property on November 4, 1964, to Seventeen Ninety-five Dunn Road, Inc. After the foreclosure sale, Seventeen Ninety-five Dunn Road, Inc. sold 30.109 of the acres on which the building was located to GEM International, Inc., and sold the remaining 76.743 acres to Johnny Investment Company. This lawsuit then followed.

### III.

### The Pleadings and Motions

On October 31, 1964, Labor Discount (plaintiff) filed its original cross-petition against the above named cross-defendants—banks and individuals. On January 22, 1965, the trial court ordered a separate trial of the claims and issues made by the pleadings of the H. B. Deal mechanic's lien suit and severed the mechanic's lien case from the issues raised by the cross-petition filed by Labor Discount. Eventually, the mechanic's lien suit of H. B. Deal proceeded to trial and the cause was decided by the Supreme Court. *H. B. Deal Construction Co. v. Labor Discount Center, Inc.*, 418 S.W.2d 940 (Mo.1967).[4]

On November 5, 1970, Labor Discount filed its third amended cross-petition against the above named cross-defendants.[5] Some three months later, on February 18, 1971, Mr. and Mrs. Shenker filed a motion

---

3. Through the combined efforts of the attorneys for State Bank, the plaintiff and Stephen Lumetta, the bankruptcy proceeding was dismissed by the petitioners on September 2, 1964.

4. By stipulation, the six banks and Labor Discount agreed that any findings of fact and conclusions of law the court might make in the mechanic's lien suit would not be used in the trial of Labor Discount's cross-petition. This stipulation was filed during the trial of the mechanic's lien suit.

5. On December 17, 1970, a memorandum suggesting the death of Bertha Wittels was filed.

for summary judgment, and on March 26, 1971, the trial court sustained the motion and rendered its judgment in their favor. Mr. Wittels also filed a motion for summary judgment and on April 14, 1971, this motion, too, was sustained.

Labor Discount's third amended petition was pleaded in a single count against the six banks and the four individual defendants. It sought substantial actual and punitive damages against all defendants. Succinctly stated, the plaintiff's third amended cross-petition averred that on or about December 18, 1962, the six banks entered into a written contract whereby the banks agreed to loan the plaintiff $1,900,000.00 for the purpose of constructing a commercial shopping and discount center and the four individual defendants agreed "to advance upon demand of . . . [the banks] . . . certain sums of money, not to exceed . . . [$100,000.00] for the purpose of completing improvements, furnishings and equipment to be installed in the . . . center." The petition further alleged the plaintiff's agreement to repay the loan, the execution of a note in the sum of $2,000,000.00 to the banks secured by a first deed of trust on the Dunn Road property owned by the plaintiff, and a financial commitment in the sum of $1,666,000.00 given to Labor Discount by the Central States, Southeast and Southwest Areas Teamsters' Pension Fund. The petition also alleged the following: (1) plaintiff fulfilled all the requirements of the agreement of December 18, 1962, (2) the banks accepted the note, deed of trust and an assignment of the financial commitment of the Pension Fund, (3) that at various times during 1963, plaintiff and the State Bank (acting as agent for the other banks) entered into discussions concerning the possibility of additional interim financing for the construction of the discount center, (4) that the several banks (by and through the State Bank) proposed that the banks would advance an additional $500,000.00 for interim financing if the plaintiff could secure an increased commitment from the Pension Fund of $734,000.00, (5) relying on these representations, plaintiff did obtain the increased commitment and assigned it to the bank, but the banks refused to advance the plaintiff any additional sums needed for interim financing, (6) plaintiff requested that the banks release the additional permanent financing commitment but that the banks refused to do so, (7) plaintiff requested the banks to demand from the individual defendants $100,000.00 for the purpose of completing the improvements at the center, but the Shenkers and the Wittels refused to abide by the original loan agreement.

Plaintiff further averred that as a result of these alleged facts and breaches, a large number of mechanics' liens were filed against the plaintiff's property, a petition for involuntary bankruptcy was filed and the plaintiff was therefore unable to meet its obligations. In addition, the banks organized a corporation [Seventeen Ninety-five Dunn Road, Inc.] for the purpose of acquiring the plaintiff's property at foreclosure. Plaintiff concluded that all these breaches of contract were willful, wanton and malicious and that the defendant banks (through their agent State Bank) and Mr. Shenker conspired to defraud, deprive and divest the plaintiff of its interests in the Dunn Road property.

In its pleadings, the banks admitted they entered into the agreement of December 18, 1962, to loan plaintiff the sum of $1,900,000.00 according to a specified percentage of the total, but denied that the agreement constituted a joint obligation of the several banks. They alleged compliance with all of the terms of the agreement and denied that the plaintiff fulfilled the terms thereof. They also denied that the State Bank was their agent and denied that the State Bank had proposed that they would advance an additional $500,000.00 interim financing. To do so, they alleged, would have constituted a violation of their "loan limits." They also denied that any request was

made of them to demand that the Shenkers and Wittels advance additional funds, although they did make such a demand. They also pleaded the statute of frauds. One of the banks—Brentwood—pleaded that the foreclosure of the deed of trust was the result of the failure of the plaintiff to finish and complete the building improvements and the failure to meet the conditions of the loan commitment with the Pension Fund.

■ The plaintiff's petition as filed causes us to conclude that plaintiff *attempted* to state a cause of action in civil conspiracy for the purpose of causing a breach of contract. But plaintiff has failed to allege the elements of that cause of action for the reason that (1) the petition does not allege an agreement, understanding or any planned cooperative action among the defendants to defraud the plaintiff, (2) the petition does not state sufficient facts from which any such agreement or understanding can be inferred. *Gruenewaelder v. Wintermann,* 360 S.W.2d 678, 688 (Mo. 1962), (3) it does not allege facts to support the essential elements of actionable fraud and (4) during the opening statement by counsel for State Bank and North County Bank, he stated that: "With that and on the understanding from Mr. Wyne's [plain-

tiff's counsel's] statement, that this case is based upon a breach of contract—he has not mentioned anything about a conspiracy —" Hence, since no conspiracy was in fact alleged, we believe that the plaintiff's pleading presented a cause of action sounding in contract and we shall review the judgment and the errors alleged by the plaintiff on the basis that the pleading does present a claim in contract and not conspiracy.

With respect to the plaintiff's appeal from the judgment in favor of the defendants, the six banks, we believe that the crucial issue is whether Mr. Frank Chervitz, Executive Vice-President of the State Bank, for and on behalf of the six banks agreed to loan additional interim financing to Mr. Stephen Lumetta of Labor Discount, for the completion of the shopping center.

## IV.

### Judgment of Trial Court and Appeal

This cause was tried by the court without a jury. Trial commenced on September 21, 1971, and concluded October 28.[6] Judgment was entered on November 11, 1972, in favor of the defendant banks. The cause against Mrs. Wittels was dismissed. Labor Discount appealed.

---

6. The court earlier entered summary judgment in favor of Mr. and Mrs. Shenker and Mr. Wittels. At the conclusion of the trial, the plaintiff was granted leave to further amend its third amended petition by alleging that after agreeing to loan the plaintiff additional interim financing and after accepting an assignment of the additional commitment for permanent financing, the banks advanced $59,289.91 to the plaintiff. The amendment also alleged that State Bank, acting as agent for the others, demanded and received the accrued interest on outstanding loans in the amount of $51,949.81 and distributed it to itself and the other banks proportionately. A new paragraph was added at this stage alleging, in the alternative, that the banks were engaged in a joint venture in the original loan commitment of December 18, 1962, and were so engaged in all subsequent matters and negotiations.

Each of the banks filed amended answers admitting receipt of the $51,949.81 as part of the interest due them pursuant to the December agreement but denied each of the other allegations.

The Shenkers' Answer to this post trial amendment admitted the signing of the December 18 agreement but alleged that it was without consideration, and denied the conversations with State Bank relative to additional interim financing, the securing of the additional commitment from the Pension Fund, and the refusal of the banks to furnish additional interim financing. The Shenkers denied that it was necessary for them to advance their share of the $100,000.00 for completion of the improvements as provided in the December 18 agreement.

Mr. Wittels filed an Answer similar to that filed by the Shenkers.

There are in effect two separate appeals in this cause—one from the judgment of the trial court in favor of the six banks, and the other an appeal by plaintiff from the action of the trial court in sustaining Mr. Shenker's pre-trial motion for summary judgment.[7]

The trial court's findings of fact and conclusions of law are essentially that the plaintiff failed to prove an enforceable contract between the plaintiff and the six banks for additional financing for the reasons that (1) Mr. Chervitz did not make a promise or an oral commitment to lend additional interim money, (2) the evidence in that respect left it wholly a matter of speculation and conjecture as to just what promise was made, (3) Mr. Chervitz had no authority to promise on behalf of the six banks or any one or more of them to lend the additional money over and above the $1,900,000.00, originally loaned, (4) the terms of the oral contract were so uncertain as to parties, the proportion of the entire loan any particular bank would lend, the maximum amount of the loan and the purpose of the loan, the time of repayment, the rate of interest, the time for payment of the interest, the commitment fee, if any,

the security for the additional loan and the lack of consents from those interests which would have been effected thereby, (5) the defendants, other than State Bank were not estopped to deny the invalidity of the contract to provide additional interim financing to the plaintiff, (6) plaintiff had failed to prove that the failure of the banks to provide the additional interim financing was either the cause in fact or the proximate cause of the loss of the plaintiff's property by foreclosure, and (7) in view of the foregoing the question of plaintiff's damages were moot.

Plaintiff presents six Points of Error for consideration in this court. Viewed in their totality, they are directed principally at the trial court's resolution of the factual issues as being "against the weight of the credible evidence," and not supported by the premises upon which the trial court arrived at its conclusions.

In reviewing these Points, we are directed to review the case upon both the law and the evidence, but the judgment is not set aside unless clearly erroneous and due regard is to be given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(d).[8] The applica-

---

7. Plaintiff failed to preserve anything for review in this court with respect to Mrs. Shenker or either of the Wittels. The Notice of Appeal reads as follows: "Notice is given that Labor Discount, Inc., appeals from the Findings, Conclusions of Law and Judgment entered in this action on the 1st (sic) day of November, 1972, and from summary judgment in favor of Morris A. Shenker and Lillian Shenker, entered on March 26, 1971." Rule 81.08(a), V.A.M.R. requires that a Notice of Appeal shall specify the judgment or order appealed from, and the failure to mention therein the summary judgment entered on behalf of Jacob M. Wittels preserves nothing for review with respect to that judgment.

Plaintiff has not briefed the action of the trial court in dismissing its Third Amended Cross-Petition against Mrs. Wittels nor in sustaining Mrs. Shenker's motion for summary judgment. The failure to brief either of these judgments in this court constitutes an abandonment of the appeal insofar as those rulings of the trial court are con-

cerned. *Metter v. Jansen*, 498 S.W.2d 581, 583 (Mo.App.1973). It should be noted here that counsel for the plaintiff when appearing before this court for argument candidly stated that the appeal as to Mrs. Shenker had been abandoned.

8. Rule 73.01(d) has been amended, effective January 1, 1975, and as amended reads: "3. On appellate review:
(a) The court shall review the case upon both the law and the evidence as in suits of an equitable nature.
(b) Due regard shall be given to the opportunity of the trial court to have judged the credibility of the witnesses."

This appeal and the briefs herein, as well as the argument in this court, preceded the effective date of this Rule change. We choose, therefore, to apply the provisions of the Rule as it existed prior to January 1, 1975, with respect to our scope of review pursuant to the authority of Rule 41.06 inasmuch as the appeal was prepared and

tion of this Rule to any particular case is subject to settled and oft-reiterated principles. See generally: *Farmers Mutual Fire & Lightning Ass'n v. LaVallee*, 501 S.W.2d 69 (Mo.App.1973). In the context of this case we conclude that some of these principles deserve repeating. First, the trial court is the arbiter of the facts in a jury-waived case, and it may believe or disbelieve the testimony of the witnesses as it chooses, even where said testimony is uncontradicted. *Miller v. Gayman*, 482 S.W.2d 414, 420 (Mo.1972). Secondly, when the determination of the issues presented at trial rests primarily upon the weight to be accorded oral testimony and rests upon the credibility of the witnesses whose testimony is in many instances conflicting, it is peculiarly appropriate that deference be accorded the findings and judgment of the trial court. *Kellum v. Cooper*, 404 S.W.2d 394, 397 (Mo.App.1966).

## V.

*The Judgment Relating to the Banks*

■ With the foregoing principles in mind, and in view of the findings of the trial court that Mr. Chervitz did not make any promise to lend additional interim financing over and above that committed in the written agreement of December 18, 1962, we find this a most appropriate case for the application of the deference rule. Two persons only were in position to know exactly what Mr. Chervitz said to Stephen Lumetta, and their versions of what was in fact said, are in irreconcilable conflict. No written document exists preserving this conversation by which its contents can be resurrected. Neither plaintiff's corroborative witnesses nor the circumstantial evidence in support of plaintiff's contentions are sufficiently persuasive to overcome an appellate court's inclination to adhere to the trial court's findings. Plaintiff's brief recognizes this, because the bulk of it is devoted to an argument of the facts from its viewpoint in an effort to emphasize every apparent inconsistency in the defendant's proof and assaults on the credibility of defendants' witnesses. Credibility is essentially for the trial court which is in position to observe the witnesses, their demeanor throughout the trial as they are present from day to day, and it is therefore in a better vantage point to resolve those conflicts in testimony which are endemic to a trial. Since the existence vel non of the alleged oral promise to plaintiff's representative—Stephen Lumetta—is the paramount issue in this case, and since the establishment of its existence depended, in the final analysis, on the production of credible oral evidence in support thereof, the finding of the trial court that no such promise emitted from Mr. Chervitz' lips would seem to settle the matter. A careful and objective reading of the record leads this court to the definite and firm conviction that the trial court did not err in its findings on this issue and the proper result was reached. Rule 73.01(d); *Bourne v. Manley*, 435 S.W.2d 420 (Mo.App.1968).

While the trial court very carefully delineated the reasons for its findings and the circumstances which to it seemed significant in support of its conclusions, no pretense was made that its enumeration was exhaustive. Plaintiff seizes upon several of these circumstances so set forth as a means of attempting to impeach the findings and conclusions reached by the trial court resulting in an unfavorable consequence for the plaintiff, apparently conceding that an error in one or more of the reasons enunciated by the trial court in support of its judgment would be insufficient to vitiate a judgment plainly correct upon the whole record. *Oliver v. Fisher*, 430 S.W.2d 611 (Mo.App.1968). We shall, nevertheless, attend to two of the findings of the trial court with which plaintiff takes issue for

presented to this court under the provisions of Rule 73.01(d) as it then existed, and appli-

cation of the Rule as amended is not, in our opinion, feasible.

**422**

the reason we conclude they merit consideration.

First, plaintiff asserts that the trial court erred with respect to the undisputed fact that several of the participating banks were committed almost to their loan limits as imposed by law. § 362.170, RSMo 1969, V.A.M.S., and 12 U.S.C.A. § 84. Plaintiff's position is that the loan limits are no defense in an action for breach of contract. The defendant banks, on the other hand, take the position that the loan limits are independently adequate to sustain the judgment and that the statutes are an absolute defense.

The weight of authority is that loan limit statutes are no defense to actions by banks against borrowers to recover for failure to repay. See generally: Anno. 125 A.L.R. 1512 (1940). Most courts hold that such statutes do not make contracts which are violative thereof, void or even unenforceable, but nearly all of the decided cases involve actions against borrowers who seek to avoid liability thereby. See: *Platte County State Bank v. Frantz,* 33 Wyo. 326, 239 P. 531, 533 (1925), and cases cited therein. One case has held that the statute has no effect when the action is brought by the borrower. *Bank of College View v. Nelson,* 106 Neb. 129, 183 N.W. 100 (1921). Cases holding agreements in violation of loan limits statutes void generally involve agreements between banks designed to subvert the regulatory purposes of the loan limit statutes. See: *Dove Creek State Bank v. Lawrence Warehouse Co.,* 157 Colo. 263, 402 P.2d 369 (1965); *Oakes Nat. Bank v. Farmers' State Bank,* 52 N.D. 49, 201 N.W. 696 (N.D.1924); *Jones v. Butler Coop. Bank,* 254 Mass. 82, 149 N.E. 657 (1925). The construction of similar federal statutes has proceeded along the same lines. See: *Jaynes v. First National Bank of Ketchikan,* 236 F.2d 258 (9th Cir. 1956); *Live Stock State Bank v. First National Bank of Fairfield,* 300 F. 945 (D.Ida.1925).

No Missouri cases have been found which have held that the loan limit statutes bar an action by a borrower for breach of contract. The few available cases discussing predecessors of § 362.170 have declined to find the contract void. *Brown v. Stotts City Bank,* 327 Mo. 747, 38 S.W.2d 722 (Banc 1931); *McClintock v. Central Bank of Kansas City,* 120 Mo. 127, 24 S.W. 1052 (1894). It would appear therefore, absent knowledge of a given bank's loan limits, a borrower should be able to hold a bank liable for breach of contract to make a loan, even though in making the loan the bank would exceed its limits. It is our view that the statutes are for the regulation of banking institutions and the officers thereof and not for the frustration of well-meaning though unwary borrowers.

Whether the loan limit statutes are a bar to plaintiff's cause of action does not mean that the trial court committed error. Loan limitations are a circumstance which the trial court might well consider as some evidence in support of its finding that the promise allegedly made by Mr. Chervitz was not, in fact, made. It is a reasonable inference that a bank or one of its officers would not commit itself to a loan in excess of its lawful limits under ordinary circumstances, even in those instances where the limits might be increased by action of the bank's board of directors. There was unrefuted testimony by Mr. Chervitz that loan limits, when legally appropriate, could be increased, but an increase in loan limits can be made only by increasing surplus from undivided profits. He testified that there are two considerations which a bank has to take into account in deciding whether surplus should be increased from the undivided profits. These were (1) undivided profits are necessary because no dividends can be paid out of surplus but only out of undivided profit, and (2) undivided profits must be accrued to protect against losses or unexpected expenditures and once the undivided profits are transferred to surplus there is no

way to return them to undivided profits should the need arise. As a matter of fact, the loan limits of State Bank were increased from $500,000.00 to $600,000.00 effective at the end of 1963 and it was by reason of this increase that State Bank was able to loan the $59,289.81 to plaintiff as evidenced by a note dated January 9, 1964, to provide funds whereby plaintiff paid the service fee of the Pension Fund in the amount of $7,340.00 for the additional commitment for permanent financing and other interest.

Under the facts of this record, we find no error in the consideration by the trial court of the loan limits of the banks in arriving at its judgment.

The second finding of the trial court as an independent basis for its judgment attacked by plaintiff and which we consider is the question of the agency relationship of Mr. Chervitz to the other banks. The trial court found that Mr. Chervitz had no authority, either express or implied, to commit the banks to increase their loans to the plaintiff. The trial court further found that the banks were not joint-venturers.

■ The existence of an agency relationship is a question of fact for the trier of facts, and this finding of the trial court will not be set aside unless clearly erroneous. These rules are no less applicable to the question of a joint-venture. *Jeff-Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5 (Mo. 1970); *Baker v. St. Paul Fire & Marine Ins. Co.,* 427 S.W.2d 281 (Mo.App.1968).

■ There is an insufficiency of evidence in this case to establish the existence of any express agency, and plaintiff must rest its case on the existence of apparent authority, if at all. Apparent authority arises from the acts of the alleged principal, not from the acts of the agent; it rests on representations made by the reputed principal and reasonably relied on by the third party. *Jeff-Cole Quarries, Inc. v. Bell,* supra; *Fielder v. Production Credit Ass'n,* 429

S.W.2d 307 (Mo.App.1968); Seavey, The Rationale of Agency, 29 Yale L.J. 860–1 (1920).

A review of the evidence suggests that plaintiff could not reasonably have relied on the apparent authority of Mr. Chervitz to bind the banks, one of which he was an officer, or, at least, that plaintiff has failed to marshal sufficient evidence to support such a reasonable reliance. By his own admission, Stephen Lumetta, plaintiff's representative in almost all of these transactions and negotiations, dealt almost exclusively with Mr. Chervitz as he had been told to do at the outset. He knew that Mr. Chervitz was to "manage the loan." The written commitment of December 18, 1962, was executed for State Bank by Mr. Chervitz only, and execution of the commitment of the other banks was by officers thereof separately. Stephen Lumetta knew or should have known from the exhibit attached to the commitment of December 18, 1962, that each of the banks participated in the loan to the extent specified therein, and there is no evidence that the officers of any of the other banks or anyone for them represented that either Mr. Chervitz or State Bank was clothed with authority to modify the agreement of December 18, 1962, in any material respect. Although State Bank was denominated as the "lead bank" and plaintiff's transactions after execution of the agreement of December 18, 1962, were with State Bank, there is no evidence to indicate that the plaintiff could justifiably conclude that State Bank's authority extended beyond the routine matters of disbursing the loan funds, receiving notes, and generally handling the paper work of the transaction. It was ultimately within the trial court's province to believe or disbelieve any evidence offered by the plaintiff with respect to Mr. Chervitz's authority made by any of the officers of the other participating banks.

On the whole record, plaintiff did not establish the requisite elements of apparent

authority of Mr. Chervitz to act for the other banks. See: *Nelle Plumbing Co. v. Stefanic,* 453 S.W.2d 636 (Mo.App.1970).

Mr. Chervitz' position with State Bank is viewed from a different vantage point, however. He was a vice-president of State Bank and the leading participant in the preliminary negotiations, and might reasonably be believed to possess broad authority in the making of loans for State Bank. See: Restatement, Second, Agency, §§ 27, 49 (1958). Although the trial court found that there was no evidence that Mr. Chervitz had authority from State Bank and no authority from the five other banks to loan any money in addition to the $1,900,000.00, a person who has knowledge of an agent's employment and knows the extent of that agent's authority may reasonably infer that the agent has authority to do those things which it is usual for a person in his position to do, and reliance on such authority is justified. Restatement, Second, Agency, § 27, Comment d, § 49, Comment c (1958); see also: *Wynn v. McMahon Ford Co.,* 414 S.W.2d 330, 337[8] (Mo.App.1967); *Home Owners Loan Corp. v. Thornburgh,* 187 Okl. 699, 106 P.2d 511 (1940). Nonetheless, when other circumstances were considered by the trial court with respect to the loan limits, the uncertainty of the terms of the alleged promise, we conclude that there was no error in the finding of the trial court that Mr. Chervitz had no authority to loan money in addition to the $1,900,000.00 commitment.

Plaintiff's argument that the relationship between the banks was that of joint adventurers, like its agency argument, is a question of fact which the trial court decided adversely to the plaintiff. We conclude that there was no error in this finding.

The legal concept of "joint adventure," while of comparatively recent origin, is founded entirely on contract, either express or implied. It can exist only by voluntary agreement of the parties. It has been defined as an "association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." 48 C.J.S. Joint Adventures § 1a. It is in the nature of a partnership, generally governed by the same rules of law, the principal difference being that a joint adventure is usually limited to a single transaction. As a general rule, in order to constitute a joint adventure there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in the losses as may be sustained. 48 C.J.S. Joint Adventures § 2a; *Bell v. Green,* 423 S.W.2d 724, 731 (Mo. banc 1968).

The transaction in this case as between the banks is not a joint adventure, since it does not possess the elements of that relationship. There is here no "profit" to be shared among the participating banks; they are each to receive the principal and interest charged on their respective share of the total amount loaned in accordance with their participation therein as specified in Exhibit B attached to and made a part of the loan commitment agreement of December 18, 1962. "Profit" is defined in Webster's New International Dictionary, 2d Ed., unabridged, as "The excess of returns over expenditure in a given transaction or a series of transactions; as: a. The excess of price received over the price paid for goods sold. b. The excess of price received over the cost of purchasing and handling, or of producing and marketing, particular goods * * * 4. Excess of income over expenditure, as in a business or any of its departments during a given period of time." Under the Missouri law, "profit" in the ordinary acceptation of law is the benefit of or the advantage remaining after all costs, charges and expenses have been deducted from income. *Sidney Smith, Inc. v. Steinberg,* 316 S.W.2d 243, 255 (Mo.App.1958). "Interest," as that term is used with respect to the lending of money, is "the compensation allowed by law, or fixed by the parties,

for the use or forbearance of money, or as damages for its detention." 47 C.J.S. Interest § 1. "While it has been said that interest is a profit or income, profits are not the same as interest. Profit is the gain made on any business or investment when both receipts and disbursements are taken into consideration, whereas interest is the compensation for the use or forbearance or detention of money and contemplates that both the principal and agreed rate of interest shall be returned to the lender." 47 C.J.S. Interest § 1. As more tersely put, "Roughly, 'interest' is the rental price of money." *Wilshire Holding Corporation v. Commissioner of Internal Revenue*, 262 F.2d 51 (9th Cir. 1958). We hold that the trial court was correct in its findings in this respect.

■ Plaintiff's argument of estoppel is likewise without merit. It is axiomatic that the acceptance of benefits under an alleged contract is a bar to the denial of the existence or the validity of the contract by one who has been the beneficiary of its provisions. *Dubail v. Medical West Building Coop.*, 372 S.W.2d 128, 132[1] (Mo.1963). Similarly, an agreement concluded by an alleged agent may be ratified by the principal's acceptance of the benefits thereunder, thereby precluding the principal's denial of the agent's authority. Restatement, Second, Agency, § 99 (1958).

■ The question here is whether the defendant banks obtained any benefits of the purported contract. The Pension Fund increased its permanent financing commitment which in turn was assigned to State Bank. Whether this was required by the December 18, 1962, commitment of the banks is at least arguable. The $59,000.00 claimed as an "advance" on the amended commitment's additional $500,000.00 is evidenced by a note to the State Bank; participation certificates were issued by the State Bank to the Bond Investment Company on this loan and it is most assuredly then a fact question whether this was truly an advance as contended by the plaintiff or merely an independent transaction as contended by the defendant banks. Plaintiff adduced no evidence in support of its position, and the trial court did not find that the purported "benefits" were accepted by the banks with any knowledge of the alleged oral promise essential to ratification on their part. Restatement, Second, Agency, § 99 (1958); *Wilks v. Stone*, 339 S.W.2d 590, 595–6[12] (Mo.App.1960). There was in this case evidence that the banks had no knowledge of the alleged promise of Mr. Chervitz, and the trial court could accept or reject this evidence as it saw fit. It chose to accept it.

■ The finding of the trial court that plaintiff failed to prove a contract of sufficiently definite terms to admit of enforcement is, in our opinion, well-founded. The amount of the alleged promise for additional interim financing was the subject of inconsistent testimony by some of plaintiff's own witnesses, although one might conclude that the most likely figure was $500,000.00. There was not, however, any evidence as to due date, security, rate of interest, time for payment, etc. Taken alone, the absence of any one of these terms might not be of great significance; viewed collectively, however, their absence is fatal and the alleged promise was correctly found by the trial court to be too indefinite to admit of enforcement. *John Deere Company of St. Louis v. Short*, 378 S.W.2d 496, 503 (Mo.1964); Restatement, Contracts, § 32 (1932).

■ The trial court's finding on the conspiracy issue is amply supported by the pleadings and the record. Plaintiff's evidence, direct and circumstantial, fails to prove any agreement or combination between the banks and Mr. Shenker, or between State Bank, as agent for the banks, and Mr. Shenker, to defraud plaintiff and deprive or divest it of the Dunn Road property. Nor does it prove any malice, ill-will or wantonness. *John Deere Company of St.*

*Louis v. Short,* supra. Clear and convincing evidence is, required to establish a conspiracy, and where the proof of conspiracy is as consistent with honesty and good faith as it is with a fraudulent purpose, it will be referred to the better motive. *National Rejectors, Inc. v. Treiman,* 409 S.W.2d 1, 50[38] (Mo. banc 1966).

Had the trial court found an actionable promise by Mr. Chervitz, plaintiff might have some validity in its Point that the trial court erred in finding its damages moot. However, having already held that the finding that Mr. Chervitz never made the promise as alleged by plaintiff was supported by the evidence, we find no error.

◼ With respect to the causation issue, for plaintiff to recover for the loss of its land and the improvements thereon, it would have to prove the unavailability of alternative sources of funds or justifiable reliance on the promised source exclusively. *Heddin v. Schneblin,* 126 Mo.App. 478, 104 S.W. 887, 890 (1907); Anno., 36 A.L.R. 1408, 1429ff (1925). There was, in the record, evidence from which the trial court could find that the plaintiff could have obtained the necessary funds by closing the Pension Fund's commitment and thereby precluded the consequential loss of the land and the damages flowing therefrom, but in order to avoid the repayments which commenced with the first disbursement of the funds from the moneys received for memberships in the discount store and the leases from the tenants, plaintiff chose to delay the closing and thus brought about the resulting losses.

◼ Plaintiff's argument with respect to the unfavorable inferences which might properly be drawn by reason of the failure to produce certain witnesses—the officers of the other banks—overlooks the rule that no unfavorable inference may be drawn where the witnesses actually produced at trial have equal or superior knowledge than that possessed by those not produced.

*Wilson v. Miss Hullings Cafeterias, Inc.,* 360 Mo. 559, 229 S.W.2d 556, 562 (1950). At best, any unfavorable inference to be drawn by the trier of fact is "permissive" only and in this instance the trial court is at liberty to draw the inference or not as it chooses. McCormick, Handbook of the Law of Evidence, 656–9 (2d ed. 1972).

◼ Complaint is made that the action of the trial court in sustaining the motion of Mr. and Mrs. Shenker for summary judgment prejudiced the plaintiff for the reason that had Mr. Shenker remained a party, "the evidence that could or may have been produced with Mr. Shenker as a party *may* well have thrown an entirely different light upon the whole matter of the conspiracy and the court's finding thereon." (Emphasis supplied). The thrust of this argument is that by its very nature civil conspiracy necessitates that at least two parties participate in the unlawful acts and evidence to prove the charge must necessarily relate to and involve more than one party. Plaintiff admits that it could have subpoenaed Mr. Shenker as its own witness and, if it chose to call him to the stand, might have been permitted to treat him as an adverse witness, but seeks relief from this method of adducing evidence by contending that to do so "is filled with risk and many pitfalls as this court and numerous trial counsel know from bitter experience." Without specifically pointing out any evidence which Mr. Shenker might have supplied, plaintiff concludes by calling upon this court to speculate as to the evidence Mr. Shenker might have furnished when it says: ". . . [W]e suggest that there is every reason for this court to believe far more facts can be developed with Morris Shenker as a party defendant . . . ." This is a rather novel suggestion, but we do not base our holding on the novelty of the approach but rather on the conclusion that plaintiff has not, in the absence of some showing that Mr. Shenker's testimony would have supplied the "missing link" in its conspiracy theory,

convinced us that its tactical decision to forego the calling of Mr. Shenker as a witness in its case should be overlooked and used to provide it a springboard to a new trial for a second opportunity to supply the "missing link".

Upon all the evidence in the record we find no error in the judgment of the trial court with respect to the defendant banks, and we thus affirm the judgment of the trial court.

## VI.

### The Summary Judgment Relating to Mr. Shenker

In disposing of plaintiff's appeal from the judgment of the trial court entered on behalf of Mr. Shenker after sustaining his motion for summary judgment, we first proceed to an examination of the plaintiff's Third Amended Cross-Petition and Mr. Shenker's motion and documents filed in support thereof to determine whether there is merit in those points raised by plaintiff and preserved for review in this court.

We have heretofore stated our conclusion that plaintiff's Third Amended Cross-Petition, stripped of the surplusage, pleads a cause of action for breach of contract against Mr. Shenker, based upon paragraph 11 of the commitment of December 18, 1962, whereby Mr. Shenker agreed:

" . . . if necessary and in order to complete the improvements and furnishings and equipment in accordance with the plans and specifications . . . upon ·demand of the undersigned banks . . . ."

to advance $50,000.00. We have previously discussed the answer filed by Mr. Shenker, whom we shall hereinafter identify as the defendant in this appeal from the judgment sustaining his motion for summary judgment.

On February 18, 1971, defendant filed his motion for summary judgment. The motion urged the court to grant summary judgment and alleged that (1) plaintiff's cause of action was "purportedly based on an alleged breach of contract" with respect to the provisions of paragraph 11 of the agreement of December 18, 1962, (2) on December 5, 1962, prior to the execution of the agreement of December 18, 1962, plaintiff had entered into a construction contract with H. B. Deal for the construction of a building to be used as a discount house and shopping center on the Dunn Road property, (3) the construction contract required Deal to furnish all material and do the work according to specifications and drawings prepared by the architects and to erect the building and other improvements on the property for a guaranteed total cost of $1,250,000.00 including Deal's fixed fee of $50,000.00, (4) there was a total savings of $82,734.80 in the construction of the Discount Center and there were savings in the awards to the subcontractors in the same amount, (5) the cost of construction was $82,734.80 less than the original contract price "as modified by changes in the work," (6) as to the contract as originally written, there would have been a surplus in the escrow account equal to that amount, (7) the contract of December 18, 1962, provided for a payment to Security Trust Company out of the first proceeds of the $1,900,000.00 loan, a sum of $569,243.16 for the purpose of discharging an outstanding note and deed of trust encumbering the realty at the time plaintiff purchased it, (8) $569,613.28 from the first draw or disbursement of the loan proceeds was used to pay the amount due on the outstanding note and deed of trust aforesaid, (9) the contract of December 18, 1962, provided for the payment out of the loan proceeds a service fee of $19,-000.00 to the six participating banks, (10) the loan was in excess of the total of the payments for the completion of the improvements, furnishings and equipment in accordance with the plans and specifications referred to in paragraph 11 of the contract so that no advance was necessary in order

to complete the improvments, furnishings and equipment and that therefore he was not liable under paragraph 11 of the contract.

In support of his motion, the defendant filed the following exhibits:

A. A copy of the agreement of December 18, 1962,

B. The construction contract entered into by the plaintiff and Deal,

C. The Supreme Court opinion in the H. B. Deal merchanics' lien case,

D. and E. Excerpts from the testimony of John J. Mincher, the project manager on the job for H. B. Deal, given in the mechanic's lien trial, properly certified by the Clerk of the Supreme Court.

The plaintiff did not respond to this motion and filed no counter-affidavits or other documentary evidence. On March 26, 1971, the motion for summary judgment was argued, submitted and sustained, and a finding judgment in favor of defendant was entered.

Plaintiff, Labor Discount, contends that the documents filed by the defendant in support of his motion for summary judgment do not show by unassailable proof that he is entitled to a summary judgment as a matter of law; that the pleadings show that there was a genuine issue of material fact whether a demand was made upon the defendant to furnish the additional funds; and that the motion and documents filed in support thereof failed to negate the allegations of conspiracy and fraud alleged in plaintiff's Third Amended Cross-Petition.

Counsel for the defendant respond and contend that a summary judgment may be based on the pleadings, and that plaintiff's Third Amended Cross-Petition and the agreement of December 18, 1962, on their face show that defendant was not a party to the contract sued upon because, they argue, a new and substituted agreement which was made only with the banks is the basis for plaintiff's cause of action, and by entering into this new and substituted agreement with the banks, plaintiff has abandoned and abrogated the prior agreement to which the defendant had been a party. Defendant also contends that (1) his promise to advance $50,000.00 was not an unconditional one, but rather was to be performed *if necessary* in order to complete the improvements, furnishings and equipment in accordance with the plans and specifications, (2) the portion of the Third Amended Cross-Petition averring a conspiracy contains no averment that they [Shenkers] committed or omitted any act or thing pursuant thereto in connection with the alleged conspiracy, nor that they did any unlawful act pursuant to the alleged conspiracy. Defendant further argues that the documents attached to his motion for summary judgment as exhibits, to which plaintiff did not respond, conclusively show that the building was completed in accordance with the plans and specifications, accepted by the plaintiff, and occupied, and in the absence of any evidence in opposition thereto, the facts stated in the exhibits stand admitted, so that there was no obligation on his part to advance any money.

Defendant further moves this court to dismiss the appeal on the grounds that the plaintiff violated Rule 84.04(a)(1) and (c) because it did not make a fair statement of the facts with respect to the exhibits and documents filed in support of his motion or make a fair statement of facts as required by Rule.

 Rule 84.04(c) provides: "The statement of facts shall be a fair and concise statement of the facts relevant to the questions presented for determination without argument." This provision is intended to afford an immediate, accurate, complete and unbiased understanding of the facts of the case." *Wipfler v. Basler,* 250 S.W.2d 982, 984[3] (Mo.1952); *Geiler v. Boyer,* 483 S.W.2d 773, 774[1] (Mo.App.1972).

We do not, however, conclude that the omission from the plaintiff's statement of facts of any reference to the exhibits and documents attached to defendant's motion for summary judgment calls for the harsh relief sought by way of dismissal and we so hold.

While we believe it unnecessary to review at length the principles governing Summary Judgment under Rule 74.04, a reading of the cases demonstrates that courts must be wary in granting summary judgments lest a denial of due process be countenanced. The reviewing court is required to examine the record before it in the light most favorable to the party against whom summary judgment is granted. The movant is required to show by unassailable proof that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Kroh Bros. Development Co. v. State Line Eighty-Nine, Inc.*, 506 S.W.2d 4 (Mo.App. 1974); Rule 74.04(h). It has often been said that a genuine issue of material fact exists when there is the slightest doubt as to a material fact. *Pitman Mfg. Co. v. Centopolis Transfer Co.*, 461 S.W.2d 866, 873 (Mo. 1970). Our courts have been advised that the remedy of summary judgment is an extreme and drastic one to be exercised with great care. *King Bros. Development Co. v. State Line Eighty-Nine, Inc.*, supra, l.c. 10[1].

Plaintiff did not respond to defendant's motion; rather it chose to present its argument to the trial court, and we are not favored with said arguments as a part of this record. Rule 74.04(e) provides that when a motion for summary judgment is made and supported as provided in the Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue of fact for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. Nevertheless, the case law is that a summary judgment may not be granted in a case where the evidentiary facts set forth in the matters supporting the motion fail to negate a material issue raised by the pleadings, even where the opposing party has failed to file an appropriate response. *Estate of Sample v. Traveler's Indemnity Company*, 492 S.W.2d 829, 833 (Mo.1973). Let us then proceed to examine defendant's motion and supporting documents to determine whether they negate every material issue raised by plaintiff's pleadings.

Defendant's first contention, that plaintiff has brought its cause of action on a new and different contract than that to which he was a party, was not raised in his motion for summary judgment and is presented here for the first time. In the case of a summary judgment, an appellate court may review the action of the trial court on the whole record and will not reverse a correct result even where granted for the wrong or insufficient reasons, *Spires v. Lawless*, 493 S.W.2d 65, 68 (Mo.App. 1973), and if defendant's contention is valid, then the summary judgment entered by the trial court should be sustained in spite of the fact that this argument was not presented in the trial court.

A new contract may abrogate an old one, and non-performance of the new does not work a reinstatement of the old. All actions must lie on the new contract. *Carman v. Harrah*, 182 Mo.App. 365, 170 S.W. 388, 393[3] (Mo.App.1914). Whether the new contract constitutes a discharge of the old often depends upon the intention of the parties. Plaintiff's Third Amended Cross-Petition does not allege that this defendant was a party to the alleged oral promise of Mr. Chervitz that the banks would advance additional interim financing if plaintiff obtained an increased permanent financing commitment from the Pension Fund. Rather, as we read plaintiff's Third Amended Petition, it alleges the writ-

ten agreement of December 18, 1962, to which defendant was a signatory, that defendant agreed to advance upon demand of the banks certain sums of money not to exceed $50,000.00 for the purpose of completing the improvements, etc., and that although demand was made upon defendant to perform, defendant failed and refused to do so. Plaintiff then avers that defendant's breach of his obligations under the written agreement of December 18, 1962, together with the breach of the alleged oral promise of Mr. Chervitz that the banks would furnish additional interim financing to complete construction of the discount center combined to directly and proximately cause a large number of mechanics' liens and a petition in involuntary bankruptcy to be filed against plaintiff, plaintiff was thereby unable to meet its obligations to its creditors and the culmination of these circumstances caused plaintiff to lose the Dunn Road property at foreclosure.

Under the terms of the agreement of December 18, 1962, defendant's obligations were conditioned on the following: (1) necessity, (2) in order to complete the improvements, furnishings and equipment in accordance with the plans and specifications, and (3) a demand of banks.

 From a careful reading of plaintiff's Third Amended Cross-Petition, we conclude that by reason of the manner in which it joined in a single count (what we construe to be two separate and distinct contracts to one of which defendant is not alleged to have been a party) tends to confuse the issues, unless the pleading is, as we have heretofore stated, one of civil conspiracy for the purpose of causing a breach of contract and fraud. We are led to this conclusion by the allegations in the pleading that the alleged breaches of contract were "willful, wanton and malicious" and that the banks and this defendant "thereby conspired to defraud, deprive and divest plaintiff of its property." Further, the ad damnum portion of the Third Amended Cross-Petition seeks both actual and punitive damages. Punitive damges are not ordinarily allowable in a suit for breach of contract; they are appropriate in a suit sounding in tort involving the commission of fraud. An action in civil conspiracy sounds in tort and is in the nature of an action on the case upon the wrong done under the conspiracy alleged, and the gist of the action is not conspiracy, but the wrong done by the acts in furtherance of the conspiracy or concerted design resulting in damages to the plaintiff. *Byer Bros. Real Estate & Ins. Agency, Inc. v. Campbell*, 353 S.W.2d 102, 105–6[2] (Mo.App.1961). However, for reasons hereinbefore stated in considering plaintiff's appeal from the judgment for the banks, we shall consider the allegations with respect to fraud and conspiracy as surplusage and proceed to consider the issues on the basis of a suit on a contract.

We note at the outset that nowhere in plaintiff's Third Amended Cross-Petition is it pleaded that the advancing of funds by defendant was "necessary in order to complete the improvements and furnishings and equipment in accordance with the plans and specifications," a prerequisite to defendant's performance within the terms of the agreement of December 18, 1962. The mere allegation that the banks, at plaintiff's request, made demand upon the defendant to perform is not alone sufficient to impose any duty of the defendant to advance the moneys promised nor to create a material issue of fact in that respect.

 Plaintiff contends that the finding of the Supreme Court that the cost of the project was $1,374,146.75—well in excess of the original contract guarantee of $1,250,000.00—and that savings of $82,734.80 was "in awards to sub-contractors" demonstrates that there is an issue of material fact which would preclude the granting of summary judgment. However, plaintiff's pleadings contain no allegation that defendant's promise was to be performed under any circumstances if the construction

costs exceeded the agreed maximum of $1,250,000.00; rather, the contract upon which plaintiff founds its cause of action provides that the funds to be advanced by the defendant were contingent on the necessity for said funds for completion in accordance with the plans and specifications. The plans and specifications countenanced were those "which have been or will be approved by you [the plaintiff], the undersigned Banks, and by the Real Estate Research Corporation." Nowhere in plaintiff's pleading is there any allegation that the guaranteed maximum construction costs of $1,250,000.00 were increased by reason of any changes in the plans and specifications approved in accordance with the terms of the agreement of December 18, 1962, or any of the other documents executed in accordance with the requirements thereof. As a matter of fact, plaintiff does not state the reason why it became necessary during 1963 for it to discuss with the banks increasing the amount of the interim financing. We may deduce from reading the Supreme Court's opinion that this became necessary by reason of the 52 change orders in the plans and specifications made by the plaintiff during the course of construction. There is no allegation that the defendant, or anyone acting for him, approved these change orders or any one of them, either actually or constructively, and whether they were "necessary" was not established by the opinion of the Supreme Court. While it has been said, *Stoffel v. Mayfair-Lennox Hotels, Inc.*, 387 S.W.2d 188, 193[11] (Mo.App.1965); *Cooper v. Finke*, 376 S.W.2d 225, 230 (Mo.1964), that a motion for summary judgment is not the vehicle by which the sufficiency of the plaintiff's petition to state a cause of action upon which relief may be tested, nevertheless, we cannot ignore that an important and fundamental purpose of the summary judgment proceedings is to speed the final determination of that class of cases where there is, in fact, no real need for the delay and expense incident to a trial or no substantial issue of material fact, and where the case on the pleadings, motion and the supporting documents show that the moving party is entitled to a summary judgment as a matter of law. *Kroh Brothers Development Company v. State Line Eighty-Nine, Inc.*, supra, l.c. 10[5]. Defendant does not attack the sufficiency of plaintiff's Third Amended Cross-Petition; rather, he contends that there is no issue of material fact because plaintiff's own pleadings, when taken together with the exhibits filed with his motion, demonstrate that he is not liable under the terms of the contract upon which plaintiff bases its claim.

We conclude for the foregoing reasons that summary judgment was proper and the trial court did not err in so holding.

■■■ Plaintiff contends that because the defendant failed to negate the allegations of conspiracy and fraud contained in its petition there remained a material issue of fact. Defendant responds to this by contending that the failure of the plaintiff to aver the elements necessary to support the conspiracy issue, no material fact on the conspiracy theory is presented. A bald allegation of civil conspiracy states no cause of action; the petition must not only allege that the defendants conspired and agreed to do an unlawful act, but it must also allege that pursuant to the agreement the defendants did some unlawful act which resulted in damages to the plaintiff. *Howe v. St. Louis Union Trust Co.*, 392 S.W.2d 625, 628 (Mo.1965). Since the allegation of conspiracy alone can establish no actionable wrong, it may be admitted or denied without raising any issue of material fact, and the failure to controvert such an allegation in a motion for summary judgment does not preclude entry of summary judgment in those circumstances.

The greater portion of plaintiff's argument in support of its contention on this point is directed to the tactical disadvantage it claims it suffered when defendant

was favored with summary judgment and was no longer a party to the law suit and it therefore had to proceed to trial and was precluded from calling him as a witness in its case in chief in the role of a party defendant. We have already dealt with this point elsewhere in this opinion and held that it was without merit. We so hold here.[9]

## VII.

### Conclusion

Finding no error in the action of the trial court in sustaining defendant Shenker's motion for summary judgment or in entering judgment in favor of the defendant banks and against the plaintiff, we affirm the judgment of the trial court.

The judgment is affirmed.

All concur.

9. On the right to impeach one's own witness, see: *State v. Granberry*, 491 S.W.2d 528 (Mo. banc 1973); Ross, Impeaching One's Own Witness in Missouri, 37 Mo.L. Rev. 507 (1972).